IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SANCHEZ ENERGY CORPORATION, *et al.*, [1] | § | Case No. 19-34508 |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| SANCHEZ ENERGY CORPORATION, *et al.*, | § | |
| | § | |
| v. | § | Adv. Proc. No. 20-03057 |
| | § | |
| ROYAL BANK OF CANADA, WILMINGTON SAVINGS FUND SOCIETY, FSB and WILMINGTON TRUST, NATIONAL ASSOCIATION | § | |

## ROYAL BANK OF CANADA'S ANSWER TO COMPLAINT AND COUNTERCLAIMS

Royal Bank of Canada, as administrative agent, as lender under the Revolving Credit Facility,[2] and as predecessor Collateral Trustee (in such capacities "RBC"), files this Answer (the "Answer") to the Complaint [Dkt. No. 1] (the "Complaint"), and in support thereof would respectfully show the Court as follows:

### SPECIFIC ADMISSIONS & DENIALS

1.     With respect to the allegations in Paragraph 1 of the Complaint, the allegations constitute legal conclusions to which no response is required. To the extent a response is required,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Undefined capitalized terms will have the same meanings as in the Complaint.

RBC admits it provided financing to the Debtors.  RBC further admits that the referenced statute (Tex. Prop. Code § 13.001(a)) contains the quoted language listed in paragraph 1, but denies that the Debtors correctly applied such language to RBC.  Any remaining allegations in Paragraph 1 are denied.

2.      With respect to the allegations in Paragraph 2, the allegations constitute legal conclusions to which no response is required.  To the extent a response is required, RBC admits that certain members of the 1L Ad Hoc Group filed notices of correction without the participation of RBC.  The remainder of the allegations in Paragraph 2 are denied.

3.      With respect to the allegations in Paragraph 3, the allegations constitute legal conclusions and recitals of requested relief to which no response is required.  To the extent that a response is required, the allegations in Paragraph 3 are denied.

4.      With respect to the allegations in Paragraph 4, the allegations constitute legal conclusions and recitals of requested relief to which no response is required.  To the extent a response is required, the allegations in Paragraph 4 are denied.

5.      With respect to the allegations in Paragraph 5, RBC admits that the Correction Instruments were not executed by each party to the original recorded instrument, but denies that the Correction Instruments made material changes or that each party to the recorded instrument was required to sign the Correction Instruments.  The remaining allegations constitute legal conclusions and recitals of requested relief to which no response is required.  To the extent a response is required, RBC admits that the referenced statutes contain the quoted language listed in Paragraph 5, but denies the conclusions, inferences, and allegations that the Debtors draw from such statutes, including that the Correction Instruments made material changes.  All other allegations in Paragraph 5 are denied.

6.      The allegations in Paragraph 6 constitute legal conclusions and recitals of requested relief to which no response is required.  To the extent a response is required, the allegations in Paragraph 6 are denied.  By way of further answer, as discussed in greater detail below, the Deeds of Trust underlying the Leases identified on Schedule A to the Complaint (the "Challenged Leases") included data sufficient to identify the property with reasonable certainty and put a reasonably prudent bona fide purchaser on notice of the liens on the Challenged Leases, and therefore such liens were properly perfected notwithstanding the immaterial clerical changes in the Correction Instruments.

7.      With respect to the allegations in Paragraph 7, the allegations constitute legal conclusions and recitals of requested relief to which no response is required.  To the extent a response is required, the allegations in Paragraph 7 are denied.

8.      With respect to the allegations in Paragraph 8, the allegations constitute legal conclusions and recitals of requested relief to which no response is required.  To the extent a response is required, RBC denies the remaining allegations in Paragraph 8.

9.      With respect to the allegations in Paragraph 9, the allegations constitute legal conclusions and recitals of requested relief to which no response is required.  To the extent a response is required, at this time, RBC does not have sufficient information to admit or deny its position as to each and every lease on Schedule D, which is voluminous and contains a lengthy list of leases by "Lease Code," "Lessor Name," "Date of Lease," and other information.  Upon information and belief, while many of the leases set forth on Schedule D may not be subject to liens as of the Petition Date, RBC denies that all leases set forth in Schedule D are not subject to any recorded mortgage, deed of trust, or other lien document as of the Petition Date.  Any remaining allegations in Paragraph 9 are denied.

10.     With respect to the allegations in Paragraph 10, the allegations constitute legal conclusions and recitals of requested relief to which no response is required.  To the extent a response is required, the allegations in Paragraph 10 are denied.

11.     With respect to the allegations in Paragraph 11, the allegations constitute recitals of requested relief to which no response is required.  To the extent a response is required, the allegations in Paragraph 11 are denied.

12.     With respect to the allegations in Paragraph 12, the allegations constitute recitals of requested relief to which no response is required.  To the extent a response is required, the allegations in Paragraph 12 are denied.

13.     With respect to the allegations in Paragraph 13, the allegations constitute recitals of requested relief to which no response is required.  To the extent a response is required, the allegations in Paragraph 13 are denied.

14.     With respect to the allegations in Paragraph 14, the allegations constitute legal conclusions and recitals of requested relief to which no response is required.  To the extent a response is required, the allegations in Paragraph 14 are denied.

15.     With respect to the allegations in Paragraph 15 of the Complaint, the allegations constitute legal conclusions to which no response is required.  To the extent a response is required, RBC admits that this Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 157 and 1334.  RBC further admits this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

16.     With respect to the allegations in Paragraph 16 of the Complaint, the allegations constitute legal conclusions to which no response is required.  To the extent a response is required, RBC denies that the quoted language is quoted accurately as the words "the power to" are not part

of the quoted statute or case, but admits that this Court has jurisdiction to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

17.       With respect to the allegations in Paragraph 17 of the Complaint, the allegations constitute legal conclusions to which no response is required.  To the extent a response is required, RBC admits that venue is proper pursuant to 28 U.S.C. § 1409.

18.       With respect to the allegations in Paragraph 18 of the Complaint, RBC admits that the Debtors have consented to the entry of final orders or judgments by the Bankruptcy Court.[3]

19.       The allegations in Paragraph 19 are admitted.[4]

20.       With respect to the allegations in Paragraph 20, RBC admits that as of the date of the filing of this answer, the Debtors have continued to operate as debtors-in-possession and no trustee or examiner has been appointed in the Debtors' chapter 11 cases.

21.       The allegations in Paragraph 21 are admitted.

22.       With respect to the allegations in Paragraph 22 of the Complaint, RBC admits that Sanchez Energy Corporation is a publicly-owned Delaware corporation headquartered in Houston, Texas.  RBC further admits that certain of the Debtors acquire and develop oil and natural gas properties.  RBC lacks sufficient knowledge to admit or deny the remaining allegations in Paragraph 22.

23.       With respect to the allegations in Paragraph 23, RBC admits that it is the lender and administrative agent under the Revolving Credit Facility.  RBC's headquarters is located at 200

---

[3] As noted below, RBC also consents to entry of a final order or judgment by the Bankruptcy Court in this adversary proceeding as to the claims brought in the Complaint, but reserves its rights as to any claims or causes of action that may later be asserted.

[4] Footnote 4 of the Complaint references the incorrect bankruptcy case number.  This portion of the Complaint is therefore denied.

Bay Street, P.O. Box 1, Royal Street Plaza, Toronto, Ontario Canada M5J 2J5.  Any remaining allegations in Paragraph 23 are denied.

24.     With respect to the allegations in Paragraph 24, RBC admits that Wilmington Savings Fund Society, FBS is the successor notes trustee under the 7.25% Notes.  RBC lacks sufficient knowledge to admit or deny the remaining allegations.

25.     With respect to the allegations in Paragraph 25, RBC admits that Wilmington Trust, National Association is the successor collateral trustee under the 7.25% Notes.  RBC lacks sufficient knowledge to admit or deny the remaining allegations.

26.     With respect to the allegations in Paragraph 26, RBC admits that the Debtors previously alleged that, as of the Petition Date, their secured debt obligations consisted of (i) borrowings of approximately $7.9 million in principal amount and a $17.1 million issued and undrawn standby letter of credit outstanding under the Revolving Credit Facility (as defined below), and (ii) $500 million in principal amount of 7.25% Notes.  Various obligations remain outstanding under the Revolving Credit Facility, but the principal borrowings under the Revolving Credit Facility have been repaid and the letter of credit obligations have been terminated.  To the extent there are additional allegations in Paragraph 26, they are denied.

27.     With respect to the allegations in Paragraph 27, RBC admits that as of the Petition Date the Debtors in their capacities under the Revolving Credit Agreement had borrowed approximately $7.9 million in principal and approximately $17.1 million in an issued and undrawn letter of credit, under a $25 million revolving credit facility (the "Revolving Credit Facility").  The Revolving Credit Facility was provided pursuant to a Third Amended and Restated Credit Agreement (the "Credit Agreement") dated February 14, 2018.  RBC is the administrative agent and lender under the Revolving Credit Facility.  Subject to the terms and conditions of the various

loan documents applicable to the Revolving Credit Facility, which speak for themselves, RBC generally admits that the Revolving Credit Facility is secured by first priority liens on substantially all of the Debtors' assets, including the Shared Collateral.  Any remaining allegations in Paragraph 27 are denied.

28.     With respect to the allegations in Paragraph 28, RBC admits that $500 million in secured 7.25% notes were issued under an indenture dated February 14, 2018, by and between the parties thereto.  RBC admits that the indenture was supplemented by a First Supplemental Indenture.  Subject to the terms and conditions of the various loan documents applicable to the Revolving Credit Facility, which speak for themselves, RBC generally admits that the Restricted Subsidiaries are guarantors of the 7.25% Notes.  Any remaining allegations in Paragraph 28 are denied.

29.     With respect to the allegations in Paragraph 29, RBC admits that the 7.25% Notes and Revolving Credit Facility are secured by first-priority liens on substantially all assets of the Debtors.  RBC further admits that under that certain Collateral Trust Agreement dated as of February 14, 2018, certain obligations, including obligations held by RBC are "First-Out Obligations," which maintain a first-out payment priority under the applicable loan documents. Further, under the Final DIP Order, the First-Out Obligations have a payment priority senior to the DIP Facility.  Any remaining allegations in Paragraph 29 are denied.

30.      With respect to the allegations in Paragraph 30, RBC admits that the Shared Collateral includes (i) the Debtors' oil and natural gas properties, which were to include not less than 85% of such properties with proved reserves; (ii) 100% of the equity interests of the Restricted Subsidiaries and any of their future direct material subsidiaries that qualify; (iii) the Debtors other personal property, but excluding deposit accounts (except to the extent such accounts include

proceeds of collateral), oil and natural gas properties with no proved reserves, equity interests in SN UnSub, and other existing and future subsidiaries designated as Unrestricted Subsidiaries as defined in the loan documents.  The 7.25% Notes and the obligations under the Revolving Credit Facility, the Collateral Trust Agreement, and other loan documents are senior to all unsecured obligations.  Any remaining allegations in Paragraph 30 are denied.

31.     RBC admits that the Deeds of Trust were recorded in or about April 2018, but denies the remaining allegations in Paragraph 31.

32.     The allegations in Paragraph 32 are denied.  Further, RBC answers that neither it nor any agent of RBC had responsibility under the terms of the operative transaction documents to prepare or file the Deeds of Trust.  The Collateral Trust Agreement provided that "[b]eyond the exercise of reasonable care in the **custody** of the Collateral in its possession, the Collateral Trustee will have no duty as to any Collateral in its possession or control . . . **will not be responsible for filing any financing** or continuation **statements or recording any documents or instruments** in any public office at any time or times **or otherwise perfecting or maintaining the perfection of any Liens on the Collateral**."  Collateral Trust Agreement § 5.12.[5]  "[T]he **Company and/or the applicable Grantor shall be responsible for all filings** required in connection with any Security Document **and the continuation, maintenance and/or perfection of any such filing or the lien and security interest granted in connection therewith**."  *Id*.  "Except as provided in Section 5.12(a), the Collateral Trustee will not be responsible for the . . . validity, perfection, priority or enforceability of the Liens in any of the Collateral, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein . . ."  *Id*.  "**The Collateral Trustee hereby disclaims any representation or warranty to the current and future holders of the Priority**

---

[5] All emphasis added unless otherwise specified.

**Lien Obligations concerning the perfection of the security interests granted to it** . . . . *Id.* "The Collateral Trustee will not be responsible or liable for any action taken or omitted to be taken by it hereunder or under any other Security Document, except for its own gross negligence, bad faith or willful misconduct as determined in the final non-appealable judgment of a court of competent jurisdiction." *Id.* at § 5.5. "Notwithstanding anything to the contrary contained herein . . . the Collateral Trustee **will not be obligated to perform any of the obligations or duties of the Company or any Grantor**." *Id.* at § 5.13.

33.     The allegations in Paragraph 33 are legal conclusions to which no response is required.  To the extent a response is required, RBC admits that (i) Tex. Prop. Code § 13.001 contains the quoted language in Paragraph 33, and (ii) Tex. Prop. Code § 13.002 states that a properly recorded instrument provides notice to all persons, but denies the conclusions, inferences, and allegations that the Debtors draw from such statutes.  All other allegations in Paragraph 33 are denied.

34.     The allegations in Paragraph 34 consist largely of legal conclusions to which no response is required.  To the extent a response is required, RBC admits that certain members of the 1L Ad Hoc Group filed certain notices of correction without the participation of RBC.  The remainder of the allegations in Paragraph 34 are denied.

35.     With respect to the allegations in Paragraph 35, RBC admits that certain members of the 1L Ad Hoc Group filed notices of correction without the participation of RBC.  Any remaining allegations in Paragraph 34 are denied.  In particular, RBC was not involved in any interactions with the Debtors regarding the notices of correction and has insufficient information to admit or deny any dealings or communications relating thereto.  Further, the June 2019 Notice of Correction speaks for itself, and has been altered in the Complaint, as the Debtors admit in

footnote 8.  RBC denies the Debtors' conclusions, inferences, and allegations relating to such quoted language as it has been altered.

36.     The allegations in Paragraph 36 consist of legal conclusions, to which no response is required.  To the extent a response is required, RBC admits the Debtors did not execute the Correction Instruments.  Further, RBC admits that the quoted language appears in the Correction Instruments, but denies the Debtors' conclusions, inferences, and allegations relating to such quoted language.  RBC also admits the referenced statute contains the language quoted in Paragraph 36, but denies the conclusions, inferences, and allegations that the Debtors draw from the statute; by way of further response, the quoted statute is irrelevant because it relates only to material changes while the changes in the Correction Instruments were immaterial.  RBC also admits that the case referenced in footnote 9 contains the language quoted in such footnote, but denies the conclusions, inferences, and allegations that the Debtors draw from the case; by way of further response, the case dealt with material changes while the changes in the Correction Instruments were immaterial.  Any remaining allegations contained in Paragraphs 36 are denied.

37.     The allegations in Paragraph 37 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 37 are denied.

38.     The allegations in Paragraph 38 state that they are "for purposes of illustration" and require no response.  By way of further response, the documents speak for themselves and the Debtors admit that the "[s]nippets of the Correction Instruments" in Schedule C have been altered.  To the extent a response is required, RBC lacks sufficient information to admit or deny whether true and correct copies of the referenced documents were attached to the Complaint.

39.     With respect to the allegations in Paragraph 39, RBC admits that the Debtors alleged in Docket Number 11 that SN maintains a master deposit account at JP Morgan which is

SN's concentration account, and that, as of the Petition Date, the Debtors' alleged that the SN Master Account had a balance of $4.2 million.[6] RBC lacks sufficient information to admit or deny the correctness of these allegations.

40.     With respect to the allegations in Paragraph 40, RBC admits that the Debtors alleged in Docket Number 11 that SN EF Maverick, LLC maintains a deposit account at JPMorgan which serves as SN Maverick's concentration account, and that, as of the Petition Date, the Debtors' alleged that the SN Maverick Master Account had a balance of $23.3 million.  RBC lacks sufficient information to admit or deny the correctness of the allegations in Paragraph 40.

41.     With respect to the allegations in Paragraph 41, RBC admits that the Debtors alleged in Docket Number 11 that SN Payables, LLC maintains a deposit account at JP Morgan, that, as of the Petition Date, the Debtors alleged that the SN Payables Master Account had a balance of $3.6 million and was funded by the SN Master Account and the SN Maverick Master Account.  RBC lacks sufficient information to admit or deny the correctness of these allegations.

42.     With respect to the allegations in Paragraph 42, the document speaks for itself.  To the extent that a response is required, RBC admits that, other than with respect to the inclusion of slight clarifying alterations, the Debtors accurately quoted the document.

43.     With respect to the allegations in Paragraph 43, the document speaks for itself.  To the extent that a response is required, RBC admits that the document contains the quoted language, but denies the Debtors' conclusions, inferences, and allegations relating thereto.

44.     With respect to the allegations in Paragraph 44, RBC admits that as of the Petition Date, the Deposit Accounts were not subject to control agreements.  Any further allegations in Paragraph 44 are denied.

---

[6] All references to the Docket will be to the main bankruptcy case, which is case number 19-34508 (MI).

45.     The allegations in Paragraph 45 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 45 are denied.

46.     The allegations in Paragraph 46 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 46 are denied.

47.     The allegations in Paragraph 47 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 47 are denied.

48.     The allegations in Paragraph 48 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 48 are denied.

## COUNT I – PREFERENCE

49.     Paragraph 49 realleges allegations set forth in prior paragraphs of the Complaint. In response, RBC repleads and incorporates each of its corresponding responses to the respective paragraphs as if fully set forth herein.  By way of further response, RBC admits that certain members of the 1L Ad Hoc Group filed notices of correction without the participation of RBC. RBC lacks sufficient information to admit or deny the remaining allegations.

50.     The allegations in Paragraph 50 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 50 are denied.  To the extent that the defined term "Correction Instrument Transfers" in Paragraph 50 is used elsewhere in the Complaint, the allegations using this defined term are also denied.

51.     The allegations in Paragraph 51 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 51 are denied.

52.     The allegations in Paragraph 52 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 52 are denied.

53.     The allegations in Paragraph 53 are legal conclusions to which no response is required.  To the extent a response is required, RBC has insufficient information to either admit or deny the allegations in Paragraph 53.

54.     The allegations in Paragraph 54 are legal conclusions to which no response is required.  To the extent a response is required, RBC admits that the Correction Instruments were filed within the 90-day period before the Petition Date.  Any further allegations in Paragraph 54 are denied.

55.     The allegations in Paragraph 55 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 55 are denied.  By way of further response, the filing of the Correction Instruments did not enable the Collateral Trustee or the Defendants to receive more than they would have received if the cases were proceeding under Chapter 7.

56.     The allegations in Paragraph 56 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 56 are denied.

### COUNT II – DECLARATORY JUDGMENT AVOIDING CORRECTION INSTRUMENTS

57.     The allegations in Paragraph 57 are legal conclusions to which no response is required.  To the extent a response is required, RBC admits that a correction instrument that makes a material change must be executed by each party to the original recorded instrument.  By way of further response, however, the Correction Instruments did not make material changes, and therefore Texas Property Code § 5.029 is inapplicable.

58.     With respect to the allegations in Paragraph 58, RBC admits that the Correction Instruments made certain changes, but denies that such changes were material.

59.     The allegations in Paragraph 59 are admitted.

60.     With respect to the allegations in Paragraph 60, RBC has insufficient information to either admit or deny whether the affiant who executed the Correction Instrument lacked personal knowledge, and therefore denies same.  Any further allegations in Paragraph 60 are denied.

61.     The allegations in Paragraph 61 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 61 are denied.  By way of further response, because the changes in the Correction Instruments were immaterial, the statutes cited in Paragraph 61 (which apply only to material changes) are inapplicable.

62.     The allegations in Paragraph 62 are legal conclusions and statements of relief requested, to which no response is required.  To the extent a response is required, the allegations in Paragraph 62 are denied.

## COUNT III – DECLARATORY JUDGMENT AVOIDING UNDERLYING INVALID DEEDS OF TRUST AND LIENS

63.     The allegations in Paragraph 63 are legal conclusions and statements of relief requested to which no response is required.  To the extent a response is required, the allegations in Paragraph 63 are denied.

64.     The allegations in Paragraph 64 are legal and factual conclusions to which no response is required.  To the extent a response is required, RBC admits that the referenced case contains the language quoted in Paragraph 64, footnote 10; by way of further response, RBC notes that in quoting such case, the Debtors admit that a property description is sufficient if the writing "furnishes within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty."  Complaint ¶ 64, n. 10 (emphasis added).  As more fully discussed in Paragraphs 141-192 below, the Challenged Leases were described with certainty in the applicable mortgage documents, which included references to other documents that provided the means and/or data by which the Challenged Leases

could be identified with absolute or reasonable certainty.  All other allegations in Paragraph 64 are denied.

65.    The allegations in Paragraph 65 are legal conclusions and statements of relief requested, to which no response is required.  To the extent a response is required, the allegations in Paragraph 65 are denied.

## COUNT IV – LIEN AVOIDANCE IN FAVOR OF DEBTORS AS BONA FIDE PURCHASER AND HYPOTHETICAL LIEN CREDITOR – UNDERLYING INVALID DEEDS OF TRUST AND LIENS

66.    The allegations in Paragraph 66 are legal conclusions "for the sole purpose of illustration," and require no response.  To the extent a response is required, the allegations in Paragraph 66 are denied, including any allegation that the Defendants bear any burden of proof.[7]

67.    The allegations in Paragraph 67 are legal conclusions to which no response is required.  To the extent a response is required, RBC admits that the perfection of a security interest is a creature of state law.  RBC further admits that a legally valid mortgage or deed of trust is required in order to perfect certain liens.  RBC denies that a legally valid mortgage or deed of trust must be filed in each county where a contiguous tract crossing multiple counties is located.  Any remaining allegations in Paragraph 67 are denied.

---

[7] *See In re Major Funding Corp.*, 126 B.R. 504, 507 (Bankr. S.D. Tex. 1990) ("In order for the Trustee to prevail under 11 U.S.C. § 544(b) <u>he</u> must establish: 1) there was in fact a creditor in existence who was holding an allowed unsecured claim; and 2) that the transaction could have been avoided by such creditor under applicable state law.") (emphasis added); *Jones v. Wells Fargo Bank, N.A. (In re Jones)*, 573 B.R. 665, 677 (Bankr. N.D. Tex. 2017) ("Debtors bear the burden of proof under section 544(a)(3) of the Bankruptcy Code to show that they stepped into the shoes of a hypothetical bona fide purchaser without notice."); *In re Triplex Marine Maint., Inc*., 258 B.R. 659, 664 (Bankr. E.D. Tex 2000) ("Accordingly, the burden is upon the Trustee to demonstrate by a preponderance of the evidence that [defendant] possesses only an unperfected security interest for which adequate protection is not required."); *In re Munoz*, Case No. 10-31627-HCM, 2011 WL 710501, at *13 (Bankr. W.D. Tex. Feb. 22, 2011) ("It is well established that the Debtors, as Plaintiffs, bear the burden of proof under the "strong arm power" of § 544(a) to show that their rights as a hypothetical bona fide purchaser of real property under state law is superior to the rights of Defendants"); *Moser v. Toyota Motor Credit Corp. (In re Davis)*, Case No. 07-42789, 2009 Bankr. LEXIS 1031, *3 (Bankr. E.D. Tex. 2009)  ("[A] trustee has the burden of proof in an action seeking to avoid a lien . . . .").

68.     The allegations in Paragraph 68 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 68 are denied.  By way of further response, as more fully discussed in Paragraphs 141-192 below, the Challenged Leases were described with absolute or reasonable certainty in the applicable mortgage documents, which included references to other documents that provided the means and/or data by which the Challenged Leases could be identified.

69.     The allegations in Paragraph 69 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 69 are denied.

### COUNT V – CONSTRUCTIVE FRAUDULENT TRANSFER

70.     With respect to the allegations in Paragraph 70, RBC admits that the Correction Instruments were filed within two years of the Petition Date.  To the extent a further response is required, the allegations in Paragraph 70 are denied.

71.     The allegations in Paragraph 71 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 71 are denied.

72.     The allegations in Paragraph 72 are legal conclusions to which no response is required.  To the extent a response is required, RBC has insufficient information to admit or deny the allegations in Paragraph 72.

73.     With regard to the allegations in Paragraph 73, RBC has insufficient information to admit or deny the allegations.

74.     The allegations in Paragraph 74 are legal conclusions or statements of relief requested to which no response is required.  To the extent a response is required, the allegations in Paragraph 74 are denied.

75.     The allegations in Paragraph 75 are statements of relief requested, to which no response is required.  To the extent a response is required, the allegations in Paragraph 75 are denied.

### COUNT VI – LIEN AVOIDANCE IN FAVOR OF DEBTORS AS BONA FIDE PURCHASER AND HYPOTHETICAL LIEN CREDITOR – UNENCUMBERED PROPERTY

76.     The allegations in Paragraph 76 are legal conclusions, to which no response is required.  To the extent a response is required, the allegations in Paragraph 76 are denied.  By way of further response, the Debtors bear the burden of proof.[8]

77.     The allegations in Paragraph 77 are legal conclusions to which no response is required.  To the extent a response is required, RBC denies that all leases set forth in Schedule D are not subject to any recorded mortgage, deed of trust, or other lien document as of the Petition Date.  While RBC believes that many of the leases set forth in Schedule D were not subject to liens as of the Petition Date,  Schedule D is voluminous and contains a lengthy list of leases by "Lease Code," "Lessor Name," "Date of Lease," and other information, and RBC does not have sufficient information to definitively admit or deny whether the Collateral Trustee holds a lien as to each and every lease on Schedule D; therefore, any remaining allegations in Paragraph 77 are denied.

---

[8] *See In re Major Funding Corp.*, 126 B.R. 504, 507 (Bankr. S.D. Tex. 1990) ("In order for the Trustee to prevail under 11 U.S.C. § 544(b) he must establish: 1) there was in fact a creditor in existence who was holding an allowed unsecured claim; and 2) that the transaction could have been avoided by such creditor under applicable state law.") (emphasis added); *Jones v. Wells Fargo Bank, N.A. (In re Jones)*, 573 B.R. 665, 677 (Bankr. N.D. Tex. 2017) ("Debtors bear the burden of proof under section 544(a)(3) of the Bankruptcy Code to show that they stepped into the shoes of a hypothetical bona fide purchaser without notice."); *In re Triplex Marine Maint., Inc*., 258 B.R. 659, 664 (Bankr. E.D. Tex 2000) ("Accordingly, the burden is upon the Trustee to demonstrate by a preponderance of the evidence that [defendant] possesses only an unperfected security interest for which adequate protection is not required."); *In re Munoz*, Case No. 10-31627-HCM, 2011 WL 710501, at *13 (Bankr. W.D. Tex. Feb. 22, 2011) ("It is well established that the Debtors, as Plaintiffs, bear the burden of proof under the "strong arm power" of § 544(a) to show that their rights as a hypothetical bona fide purchaser of real property under state law is superior to the rights of Defendants"); *Moser v. Toyota Motor Credit Corp. (In re Davis)*, Case No. 07-42789, 2009 Bankr. LEXIS 1031, *3 (Bankr. E.D. Tex. 2009)  ("[A] trustee has the burden of proof in an action seeking to avoid a lien . . . .").

78.     The allegations in Paragraph 78 are legal conclusions, to which no response is required.  To the extent a response is required, RBC admits that security interests are governed by state law.  RBC further admits that a legally valid mortgage or deed of trust is required in order to perfect certain liens.  RBC denies that a legally valid mortgage or deed of trust must be filed in each county where a contiguous tract crossing multiple counties is located.  Any remaining allegations in Paragraph 78 are denied.

79.     The allegations in Paragraph 79 are legal conclusions to which no response is required.  To the extent a response is required, RBC denies that all leases set forth in Schedule D are not subject to any recorded mortgage, deed of trust, or other lien document as of the Petition Date.  While RBC believes that many of the leases set forth in Schedule D were not subject to liens as of the Petition Date, Schedule D is voluminous and contains a lengthy list of leases by "Lease Code," "Lessor Name," "Date of Lease," and other information, and RBC does not have sufficient information to definitively admit or deny whether the Collateral Trustee holds a lien as to each and every lease on Schedule D; therefore, any remaining allegations in Paragraph 79 are denied.

80.     The allegations in Paragraph 80 are legal conclusions or statements of relief requested to which no response is required.  To the extent a response is required, the allegations in Paragraph 80 are denied.

## COUNT VII – DECLARATORY JUDGMENT WITH RESPECT TO UNENCUMBERED PROPERTY

81.     The allegations in Paragraph 81 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 81 are denied.

82.     With regard to the allegations in Paragraph 82, RBC denies that all leases set forth in Schedule D are not subject to any recorded mortgage, deed of trust, or other lien document as of the Petition Date.  While RBC believes that many of the leases set forth in Schedule D were not

subject to liens as of the Petition Date, Schedule D is voluminous and contains a lengthy list of leases by "Lease Code," "Lessor Name," "Date of Lease," and other information, and RBC does not have sufficient information to definitively admit or deny whether the Collateral Trustee holds a lien as to each and every lease on Schedule D; therefore, the allegations in Paragraph 77 are denied.

83.     The allegations in Paragraph 83 are legal conclusions and statements of relief requested to which no response is required.  To the extent a response is required, the allegations in Paragraph 83 are denied.

### COUNT VIII – DECLARATORY JUDGMENT WITH RESPECT TO DEPOSIT ACCOUNTS

84.     With respect to the allegations in Paragraph 84, RBC admits that the Security Agreement lists deposit accounts in the definition of Excluded Assets.  All other allegations in Paragraph 84 are denied.

85.     The allegations in Paragraph 85 are legal conclusions or statements of relief requested to which no response is required.  To the extent a response is required, the allegations in Paragraph 85 are denied.

86.     RBC has insufficient information to admit or deny the allegations in Paragraph 86.  To the extent required, RBC denies the allegations in Paragraph 86.

87.     The allegations in Paragraph 87 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 87 are denied.

88.     The allegations in Paragraph 88 are legal conclusions or statements of relief requested to which no response is required.  To the extent a response is required, the allegations in Paragraph 88 are denied.

## COUNT VIII – DECLARATORY JUDGMENT WITH RESPECT TO TERRA COMMERCIAL TORT CLAIM

89.      With respect to the allegations in Paragraph 89, RBC admits that the Debtors and non-Debtor affiliates filed an action in state court alleging certain tort claims.  RBC has insufficient information to admit or deny the remaining allegations.  To the extent required, any other allegations in Paragraph 89 are denied.

90.      With respect to the allegations in Paragraph 90, RBC admits that the Debtors and non-Debtor affiliate's state court actions allege certain tort claims.  RBC further admits that the referenced UCC article contains the quoted language.  Any other allegations in Paragraph 90 are denied.

91.      The allegations in Paragraph 91 are legal conclusions to which no response is required.  To the extent a response is required, RBC admits that state law governs the perfection of security interests in commercial tort claims.  RBC further admits that the referenced case and UCC article requires a more specific description for commercial tort claims than for other types of property.  Any other allegations in Paragraph 91 are denied.

92.      The allegations in Paragraph 92 are denied.

93.      The allegations in Paragraph 93 are denied.

94.      The allegations in Paragraph 94 are legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 94 are denied.

95.      The allegations in Paragraph 95 are legal conclusions or statements of relief requested, to which no response is required.  To the extent a response is required, the allegations in Paragraph 95 are denied.

## COUNT X – RECOVERY OF AVOIDED TRANSFERS

96.     The allegations in Paragraph 96 are legal conclusions to which no response is required.  To the extent a response is required, RBC admits that the Bankruptcy Code sometimes allows a debtor-in-possession to recover property transferred pursuant to certain avoidable transfers.  However, RBC denies that the Debtors can satisfy the statutory elements and that they are entitled to any relief.

97.     The allegations in Paragraph 97 are legal conclusions and statements of relief requested, to which no response is required.  To the extent a response is required, the allegations in Paragraph 97 are denied.

## COUNT XI – DISALLOWANCE OF CLAIMS

98.     The allegations in Paragraph 98 are statements of relief requested, to which no response is required.  To the extent a response is required, the allegations in Paragraph 98 are denied.

## ATTORNEYS FEES, PREJUDGMENT INTEREST, POST JUDGMENT INTEREST, AND COSTS

99.     The allegations in Paragraph 99 are statements of relief requested, to which no response is required.  To the extent a response is required, the allegations in Paragraph 99 are denied.  By way of further response, the Debtors have not identified any particular applicable law that they believe entitles them to attorney's fees and costs, prejudgment interest, or post-judgment interest, and therefore have failed to state a claim or provide RBC with reasonable notice of the Debtors' claims.

## DEBTORS' RESERVATION OF RIGHTS

100.     The allegations in Paragraph 100 are reservations of rights, to which no response is required.  To the extent a response is required, the allegations in Paragraph 100 are denied.  By

way of further response, the deadline to challenge RBC's liens and claims has expired, and therefore the Debtors are not entitled to bring any additional claims or causes of action against RBC.

## DEBTORS' PRAYER FOR RELIEF

101.    The remaining paragraphs of the Complaint consist of a prayer for relief to which no response is required.  To the extent a response is required, the allegations contained in the remainder of the Complaint are denied, and the Court should deny the requested relief.

## RBC'S AFFIRMATIVE DEFENSES

102.    RBC pleads that the Debtors have failed to state a claim upon which relief can be granted against RBC.

103.    Pleading in the alternative, to the extent necessary, RBC pleads that the claims of the Plaintiff are barred by the Bankruptcy Court's *Interim* and *Final Order (i) Authorizing Debtors (a) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (b) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (ii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Dkt. Nos. 144 and 865 respectively] (collectively, the "DIP Orders"), based on the defenses of res judicata and collateral estoppel.

104.    Pleading in the alternative, to the extent necessary, because the Deeds of Trust specifically identified (i) the preceding mortgage which describe the Challenged Leases with absolute precision; (ii) the lease number, lessor, lessee, date of the lease, and the Book, Page, and Instrument Number, for a location where the lease is filed, (iii) the lessor, lessee, date of the lease and a county in which the lease is recorded, and (iv) by filing copies of the Deeds of Trust in all applicable counties, the Challenged Leases were described with reasonable (if not absolute) certainty, and a reasonably prudent bona fide purchaser had constructive and/or inquiry notice of

the Collateral Trustee's liens.  Under the statute of frauds, a description of property in an instrument creating an interest in land "is sufficient if the writing furnishes within itself, *or by reference to some other existing writing*, the means or data by which the particular land to be conveyed may be identified with reasonable certainty."  *AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008) (emphasis added);[9] *see also Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972); *Broaddus v. Grout*, 258 S.W.2d 308, 309–10 (Tex. 1953).

105.    Pleading in the alternative, to the extent necessary, to the extent the Debtors are asserting the statute of frauds, or seeking other equitable relief, RBC pleads the defenses of unclean hands, waiver, in pari delicto, equitable estoppel, promissory estoppel / estoppel in pais, estoppel by contract, quasi estoppel, wrongful or unlawful acts, failure to satisfy conditions precedent, release, contributory negligence, and breach of contract in response thereto.  In that connection, under the terms of the Collateral Trust Agreement the Debtors—rather than RBC—were responsible for preparing the Deeds of Trust in issue.  The Collateral Trust Agreement provided that "[b]eyond the exercise of reasonable care in the **custody** of the Collateral in its possession, the Collateral Trustee will have no duty as to any Collateral in its possession or control . . . will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times **or otherwise perfecting or maintaining the perfection of any Liens on the Collateral**."  Collateral Trust Agreement § 5.12.  "[T]he **Company and/or the applicable Grantor shall be responsible for** all filings required in connection with any Security Document and **the continuation, maintenance and/or perfection of any such filing or the lien and security interest granted in connection therewith."**  *Id*.

---

[9] Notably, the Debtors cite *AIC Management* in the Complaint.  *See* Complaint at ¶ 64, n. 10.

106.    Pleading in the alternative, to the extent necessary, with respect to the Briscoe Lease allegations, the lessor ratified, accepted, or otherwise agreed to be bound by the allegedly unsigned Briscoe Lease amendment.  To the extent the Debtors own an interest in the Briscoe Lease, the Collateral Trustee holds liens on such lease.

107.    Pleading in the alternative, to the extent necessary, the Debtors' claims are barred, in whole or in part, by the doctrines of recoupment, setoff, and/or offset, including for attorneys' fees, costs, and expenses as a result of the Debtors' negligence, unclean hands, fraud or inequitable conduct, wrongful or unlawful acts, failure to satisfy conditions precedent, and breach of contract.

108.    Pleading in the alternative, the Debtors' claims are barred, in whole or in part, because the Debtors have suffered no compensable injury or damages.

109.    Pleading in the alternative, the Debtors' claims, including claims under section 544 of the Bankruptcy Code are barred by the defenses of unclean hands, waiver, in pari delicto, equitable estoppel, promissory estoppel / estoppel in pais, estoppel by contract, quasi estoppel, wrongful or unlawful acts, failure to satisfy conditions precedent, release, contributory negligence, breach of contract, and/or because the Debtors' own acts or omissions caused or contributed to the alleged defects in issue.

110.    Pleading in the alternative, the Debtors' claims are barred, in whole or in part, by its repudiation, consent, release, ratification, waiver, estoppel, judicial estoppel, equitable estoppel, or any combination thereof, as a result of the entry of the DIP Orders and its actions leading up to the filing of the Complaint.  Under the terms of the DIP Orders, the First-Out Obligations are senior to the DIP Liens, which are not subject to challenge, and payments made on account of a

"Discharge of First-Out Obligations" are not subject to challenge; therefore, the Debtors' claims are barred.

111.    Pleading in the alternative, the Debtors' claims are barred, in whole or in part, by the fact that they failed to mitigate.

112.    Pleading in the alternative, the Debtors' claims are barred, in whole or in part, because the filing of the Correction Instruments was not a transfer and is expressly permitted under Texas law.

113.    Pleading in the alternative, the Debtors' claims are barred, in whole or in part, because the filing of the Correction Instruments was in the ordinary course of business.

114.    Pleading in the alternative, the Debtors' claims are barred, in whole or in part, because there was no transfer that enabled RBC or the Collateral Trustee to receive more than it would have received in a chapter 7 case.

115.    Pleading in the alternative, the Debtors' claims are barred, in whole or in part, because the Debtors received reasonably equivalent value.

116.    RBC reserves its right to assert any other defenses, affirmative or otherwise, that may become available during this lawsuit.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, RBC respectfully requests that the Court deny the relief requested in the Complaint.

## RBC'S COUNTERCLAIM

## RBC'S STATEMENT OF THE CASE

117.    The Complaint is based on the false premise that immaterial omissions or discrepancies in a description of certain leases invalidates the mortgage on such leases. However,

as the Debtors admitted in the Complaint, case law is clear that a property description is sufficient if the writing "furnishes within itself, <u>or by reference to some other existing writing, the means or data</u> by which the particular land to be conveyed may be identified with reasonable certainty." Complaint at ¶ 64, n. 10 (quoting *AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008)) (emphasis added).

118.    Here, even without the information contained in the Correction Instruments, a simple grantor-grantee index search based solely on the description of the Challenged Leases in the applicable mortgage documents would have put a reasonably prudent bona fide purchaser on constructive and inquiry notice of the liens on the Challenged Leases held for the benefit of the Prepetition Secured Parties' (as defined below), as the relevant mortgage documents and certain other documents incorporated by reference contained all of the means and/or data to identify the Challenged Leases with reasonable (if not absolute) certainty.

119.    Because the descriptions in the applicable mortgage documents were sufficient even without the changes made in the Correction Instruments, the attention paid to the Correction Instruments (which corrected only immaterial clerical errors) is merely a red herring.  Accordingly, RBC is entitled to a declaratory judgment that the Prepetition Secured Parties' liens on the Challenged Leases are valid and perfected.

## PARTIES

120.    Counterclaim Plaintiff is RBC.

121.    Counterclaim Defendants are the Plaintiff-Debtors including Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN EF Maverick, LLC, SN Payables, LLC, and SN UR Holdings, LLC.

## JURISDICTION AND VENUE

122.    This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtors' chapter 11 cases.  These are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

123.    This Court has jurisdiction to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §2201(a), which grants the Court the power to "declare the rights and other legal relations of any interested party seeking such declaration."  *Sommers v. Aguirre* (*In re Santoyo*), 540 B.R. 284, 289 (Bankr. S.D. Tex. 2015).

124.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

125.    Pursuant to Local Bankruptcy Rule 7008-1, RBC consents to the entry of final orders or a judgment by the Bankruptcy Court in this adversary proceeding as to the claims brought to date, but reserves its rights as to any claims or causes of action that may later be asserted.

## PROCEDURAL BACKGROUND

126.    On August 11, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").  The chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.

127.    On August 26, 2019, the U.S. Trustee appointed the Committee.

## COUNTERCLAIM FACTUAL ALLEGATIONS[10]

### A. The Prepetition Credit Agreement

128.    As of the Petition Date, Sanchez Energy Corporation ("SN") and the other Debtors, excluding Debtor SN UR Holdings, LLC ("SN UR"), pursuant to that certain Third Amended and Restated Credit Agreement dated as of February 14, 2018 (the "Prepetition Credit Agreement"), with Royal Bank of Canada, as administrative agent (in its capacity as such, the "Administrative Agent"), Royal Bank of Canada as collateral agent (in its capacity as such, the "Collateral Agent" and, in its capacity as the Administrative Agent and the Collateral Agent, the "Credit Agreement Agent") and the lenders party thereto (the "Credit Agreement Lenders" and together with the Credit Agreement Agent, the "Credit Agreement Parties"), had certain indebtedness defined in the Collateral Trust Agreement (as defined below) as the "First-Out Obligations," including, among other things, borrowings of approximately $7.9 million in principal amount and a $17.1 million undrawn standby letter of credit issued by Royal Bank of Canada (the "Prepetition L/C"), (the obligations thereunder, the "Credit Agreement Obligations") pursuant to the Prepetition Credit Agreement and the Collateral Trust Agreement.

129.    The First-Out Obligations include certain hedging obligations, including, as of the Petition Date, approximately $1 million in obligations under cash-settled commodity hedging arrangements (the "First-Out Hedging Obligations") with certain hedging counterparties (the "Hedging Counterparties"), which are secured on a *pari passu* basis with the other Credit Agreement Obligations.  Further, the First-Out Obligations include any and all obligations arising under any First-Out Document, including the Collateral Trust Agreement and Pre-petition Credit

---

[10] The allegations made in this counterclaim are made on information and belief based on the pleadings and discovery available at the time of filing, the investigation of RBC's counsel, documents and information in the public record, and inferences drawn from such sources.

Agreement, including but are not limited to, the limitations of liability set forth in Section 5.5 of the Collateral Trust Agreement,[11] the security and indemnity obligations set forth in Section 5.10 of the Collateral Trust Agreement,[12] the right to payment of compensation and expenses as set forth in Section 7.8 of the Collateral Trust Agreement,[13] the indemnity obligations under Section 7.9 of the Collateral Trust Agreement,[14] and the limitation of liability[15] and indemnity[16] provisions set forth in Section 11.03 of the Prepetition Credit Agreement.  These obligations continue to accrue (as First-Out Obligations) and are secured by the rights granted under the Final DIP Order (defined below), as well as, liens held by the Collateral Trustee.

### B.  The Secured Notes

130.    Prior to the Petition Date, pursuant to the certain Indenture for the issuance of 7.25% Senior Secured First Lien Notes (the "Secured Notes"), dated as of February 14, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Secured Notes

---

[11] "The Collateral Trustee will not be responsible or liable for any action taken or omitted to be taken by it hereunder or under any other Security Document, except for its own gross negligence, bad faith or willful misconduct . . . ." Collateral Trust Agreement § 5.5.

[12] "The Collateral Trustee will not be required to advance or expend any funds or otherwise incur any financial liability in the performance of its duties or the exercise of its powers or rights hereunder or under any other Security Document unless it has been provided with security or indemnity reasonably satisfactory to it against any and all liability or expense which may be incurred by it by reason of taking or continuing such action."  Collateral Trust Agreement § 5.10.

[13] Such right to payment includes payment of reasonable fees, costs, expenses and disbursements to the Collateral Trustee and/or its agents, including attorneys, for certain services provided under or relating to the Collateral Trust Agreement, as further detailed in section 7.8 of the Collateral Trust Agreement.

[14] "The Grantors jointly and severally agree to defend, indemnify, pay and hold harmless the Collateral Trustee . . . and each of their respective affiliates and each and all of the directors, officers, partners, trustees, employees, attorneys and agents, and (in each case) their respective heirs, representatives, successors and assigns . . . from and against any and all Indemnified Liabilities . . . ."  Collateral Trust Agreement § 7.9(a).

[15] "The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders or the Lenders . . ., and otherwise the Administrative Agent shall not be liable for any action take or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith **INCLUDING ITS OWN ORDINARY NEGLIGENCE**, except for its own gross negligence or willful misconduct."  Prepetition Credit Agreement § 11.03.

[16] "The Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers . . . unless it shall . . . be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action."  Prepetition Credit Agreement § 11.03.

Indenture"), among SN, the guarantors party thereto (the "Prepetition Debt Guarantors"),[17] Delaware Trust Company as trustee (the "Notes Trustee"), and Royal Bank of Canada, as collateral trustee (together with any successor collateral trustee under the Collateral Trust Agreement, the "Collateral Trustee" and, together with Notes Trustee, the "Trustees," and together with the Secured Noteholders, the "Secured Notes Parties," and together with the Hedging Counterparties, the Credit Agreement Parties and Royal Bank of Canada, in any and all of Royal Bank of Canada's capacities under any of the First-Out Documents (as defined in the Collateral Trust Agreement), the "Prepetition Secured Parties"), SN issued and the Prepetition Debt Guarantors guaranteed, $500 million in principal amount of the Secured Notes (together with any accrued and unpaid interest and fees, all other Obligations (as defined in the Secured Notes Indenture) under the Secured Notes Indenture or any other Note Documents (as defined in the Secured Notes Indenture), the "Secured Notes Obligations"), all of which was outstanding as of the Petition Date.

### C. Prepetition Collateral

131.    As of the Petition Date, pursuant to (i) that certain Second Amended and Restated Security and Pledge Agreement, dated as of February 14, 2018, among SN, the Prepetition Debt Guarantors, and the Collateral Trustee and (ii) those certain Amended and Restated Mortgages, Deeds of Trust, Security Agreements, Financing Statements, and Assignments of Production, effective as of April 13, 2018, for the benefit of the Collateral Trustee, the Credit Agreement Obligations and the Secured Notes Obligations were secured by first-priority liens on (a) SN's and the Prepetition Debtor Guarantors' oil and natural gas properties (which liens were required to cover not less than 85% of such properties with proved reserves); (b) 100% of the equity interests

---

[17] The Prepetition Debt Guarantors consist of all of the other Debtors, excluding SN UR.

of the Prepetition Debt Guarantors; and (c) substantially all of SN's and the Prepetition Debt Guarantors' other material personal property (collectively, the "Prepetition Collateral").

### D. The Collateral Trust Agreement

132.    Pursuant to that certain Collateral Trust Agreement dated as of February 14, 2018, among Sanchez Energy Corporation, the Grantors, and Guarantors from time to time party thereto, Royal Bank of Canada, as the First-Out Representative, Delaware Trust Company as the First Lien Representative, the other Priority Lien Representatives from time to time party thereto and Royal Bank of Canada, as Collateral Trustee (the "Collateral Trust Agreement"),[18] (i) the first-priority liens securing the Credit Agreement Obligations had a "first-out" payment priority in respect of proceeds of Prepetition Collateral and (ii) the first-priority liens securing the Secured Notes Obligations had a "second-out" payment priority in respect of the proceeds of the Prepetition Collateral.

133.    The Collateral Trust Agreement governed, *inter alia*, the liens securing the First-Out Obligations and the Secured Notes and the rights of the Debtors and the Prepetition Secured Parties with respect to the Prepetition Collateral.  The Collateral Trust Agreement established, *inter alia*, the payment priority for the Debtors' secured prepetition obligations: (i) obligations under the Prepetition Credit Agreement and certain hedging obligations (defined therein, as First-Out Obligations) had a "first-out" payment priority in respect of proceeds of Prepetition Collateral and (ii) obligations under the Secured Note Indenture had a "second-out" payment priority in respect of the proceeds of the Prepetition Collateral.  *See* Collateral Trust Agreement § 3.4.

134.    Until a "Discharge of First-Out Obligations" (as defined in the Collateral Trust Agreement), as it relates to any "Enforcement Action," the Collateral Trustee was subject to the

---

[18] A copy of the Collateral Trust Agreement is attached hereto as **Exhibit A**.

direction of RBC as the "Controlling Priority Lien Representative."  *See, e.g.*, Collateral Trust Agreement § 1.1 at pp. 4, 17 (defining Controlling Priority Lien Representative and Senior Credit Facility Agent).

135.     Until the occurrence of a "Discharge of First-Out Obligations,"[19] the Controlling Priority Lien Representative was RBC as collateral agent under the Prepetition Credit Agreement. *See* Collateral Trust Agreement § 1.1 at pp. 4, 17 (defining Controlling Priority Lien Representative and Senior Credit Facility Agent).  After a "Discharge of First-Out Obligations," the Notes Trustee under the Indenture assumes the mantle as Controlling Priority Lien Representative.  *See, e.g.*, Collateral Trust Agreement § 1.1 at pp. 4, 15 (defining Controlling Priority Lien Representative and Priority Lien Representative).

136.     Importantly, the Collateral Trust Agreement specifically delegated responsibilities in connection with lien perfection issues, and it has broad protections in favor of RBC.  For example, it states that, among other things:

a.     "[b]eyond the exercise of reasonable care in the **custody** of the Collateral in its possession, the Collateral Trustee will have *no duty as to any Collateral* in its possession or control . . . [and] will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times *or otherwise perfecting or maintaining the perfection of any Liens on the Collateral*."  Collateral Trust Agreement § 5.12 (emphasis added).

b.     "[T]he Collateral Trustee will execute, file or record . . . if it shall receive a specific written request . . . by the Controlling Priority Lien Representative . . . it being understood that *the Company and/or the applicable Grantor shall be responsible for all filings required in connection with any Security Document and the continuation, maintenance and/or perfection of any such filing* or the lien and security interest granted in connection therewith."  *Id* (emphasis added).

---

[19] The "Discharge of First-Out Obligations" is defined in the Collateral Trust Agreement.  In short, a Discharge of First-Out Obligations means the occurrence of (i) the termination of all commitments to extent loans and letters of credit that would constitute First-Out Obligations, (ii) payment in full in cash of all First-Out Obligations that are outstanding and unpaid at the time, (iii) discharge or cash collateralization of the Prepetition L/C, and (iv) collateralization of the First-Out Hedging Obligations that is substantially similar, or of substantially equal value, to the Prepetition Collateral.  *See* Collateral Trust Agreement § 1.1 at pp. 5-6.

c. "Except as provided in Section 5.12(a), the Collateral Trustee will not be responsible for the . . . validity, perfection, priority or enforceability of the Liens in any of the Collateral, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein . . . ." *Id.*

d. "The *Collateral Trustee hereby disclaims any representation or warranty* to the current and future holders of the Priority Lien Obligations *concerning the perfection* of the security interests granted to it . . . ." *Id.* (emphasis added).

e. "The Collateral Trustee *will not be responsible or liable for any action taken or omitted to be taken by it hereunder* or under any other Security Document, except for its own gross negligence, bad faith or willful misconduct as determined in the final non-appealable judgment of a court of competent jurisdiction."  Collateral Trust Agreement § 5.5 (emphasis added).

f. "Notwithstanding anything to the contrary contained herein . . . the Collateral Trustee will *not be obligated to perform any of the obligations or duties of the Company or any Grantor*."  Collateral Trust Agreement § 5.13 (emphasis added).

### E.  The Final DIP Order and the Indefeasible Payment of Certain First-Out Obligations

137.    On August 12, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing Limited Use of Cash Collateral; (ii) Obtaining Postpetition Credit Secured by Senior Liens; (iii) Granting Adequate Protection; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [Dkt. No. 26] (the "DIP Motion").

138.    On January 22, 2020, the Court entered an order approving the DIP Motion on a final basis [Dkt. No. 865] (the "Final DIP Order").  Because the DIP Lenders were subject to the Collateral Trust Agreement, the Final DIP Order granted elevated priority protections to the First-Out Obligations, in that it granted a senior "first-out" payment priority to the First-Out Obligations as it related to the DIP Liens, DIP Loans and DIP Collateral.  This was consistent with the priorities set forth in the Collateral Trust Agreement.

139.    The Final DIP Order, among other things, provided that:

a.  The DIP Liens are subject to the First-Out Obligations;[20]

b.  The continuing First-Out Obligations (including indemnity obligations) shall maintain their priority and be unaffected by the DIP Order or DIP Documents;[21]

c.  The DIP Super Priority Claims (including recourse to avoidance action proceeds) are subordinated and subject to the First-Out Obligations;[22]

d.  All payments and proceeds remitted to the DIP Agent, are subject to the First-Out Obligations;[23]

e.  The Debtors were "ordered to use the proceeds of the DIP Draws and/or other Borrowings available under the DIP Credit Agreement to effect a Discharge of First-Out Obligations;[24]

f.  RBC became "the 'predecessor Collateral Trustee' under the Collateral Trust Agreement" and "remain[ed] entitled to enforce all rights and privileges relating thereto including the immunities granted to it in Article 5 and the provisions of Sections 7.8 and 7.9 of the Collateral Trust Agreement, as well as the provisions of the Interim Order and this Final Order;"[25] and

g.  "[A]ny payments made pursuant to this Final Order relating to the Discharge of First-Out Obligations shall not be subject to Challenges."[26]

140.   Pursuant to the Final DIP Order, Wilmington Savings Fund Society, FBS ("WSFS") became the successor notes trustee under the 7.25% Notes and Wilmington Trust, National Association ("WTNA") became the successor collateral trustee.

---

[20] Final DIP Order at ¶¶ H; 5(c); 7 ("Notwithstanding anything in the DIP Documents, the Interim Order, and/or this Final Order, (i) any and all security for any and all outstanding and/or continuing First-Out Obligations (including, but not limited to, the First-Out Hedging Obligations and indemnity obligations contained in the Collateral Trust Agreement and the First-Out Documents), shall maintain its priority under applicable non-bankruptcy law and shall be unaffected by the rights and obligations granted to the DIP Lenders and the DIP Secured Parties and (ii) the priority and extent of the Prepetition Liens to the extent of the First-Out Hedging Obligations shall be unaffected by the DIP Facility or the rights and obligations granted to the DIP Lenders and DIP Secured Parties, and the First-Out Hedging Obligations shall be secured by the Prepetition Liens pursuant to this Final Order. Notwithstanding anything in the DIP Documents, the Interim Order, and/or this Final Order, no liens or security interests provided in the DIP Documents, the Interim Order, or this Final Order shall prime any valid, perfected lien or security interest securing a First-Out Obligation."); 9(a); 10.

[21] Final DIP Order at ¶ 7.

[22] Final DIP Order at ¶ 9.

[23] Final DIP Order at ¶¶ 16, 17.

[24] Final DIP Order at ¶ 7.

[25] *Id.*

[26] Final DIP Order at ¶ 23(a).

---

### F.  The Challenged Leases

141.    In the Complaint, the Debtors challenge the validity of the Prepetition Secured

Parties' liens on the Challenged Leases:

### SCHEDULE A

### LEASES THAT ARE THE SUBJECT OF CORRECTION INSTRUMENTS

| Lease Code | Lessor Name | Lessee Name | Date of Lease | Book | Page | Instrument Number | County | State |
|---|---|---|---|---|---|---|---|---|
| T0463045 | KOENNING, ROY ALLEN | EOG RESOURCES INC. | 2/10/2009 | 999 434 | 837 1 | 239874 89879 | Gonzales DeWitt | TX |
| T0616002-001 | BRISCOE RANCH, INC. | EDWARD G. VAUGHAN | 12/1/2005 | 329 330 458 460 | 138 379 515 230 | 7002 7250 78892 79159 | Dimmit Dimmit La Salle La Salle | TX |
| T0619007-001 | EVELYN I. METCALF | ANADARKO E&P COMPANY LP | 9/23/2010 | 402 | 201 | 17630 | Dimmit | TX |
| T0619007-019 | FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | 3/18/2011 | 406 | 736 | 18414 | Dimmit | TX |
| T0615001 | HARRISON INTERESTS, LTD. | P RANCH WORKING INTEREST, LLC | 5/12/2010 | 2943 386 505 | 294 510 161 | 1072987 15055 86051 | Webb Dimmit La Salle | TX |
| T0474005 | HAUSSER, ROBERT JR., ET AL. | SEP HOLDINGS II, LLC | 6/7/2010 | 314 76 | 128 625 | 81407 126770 | Zavala Frio | TX |
| T0463003 | PILGRIM LAKE, LTD. | SEP HOLDINGS II, LLC | 8/25/2008 | 989 269 | 143 759 | 237576 61055 | Gonzales De Witt | TX |
| T0616002-002 | THE MOODY FOUNDATION, ET AL. | EDWARD G. VAUGHAN | 12/1/2005 | 460 329 | 233 487 | 79160 7079 | La Salle Dimmit | TX |

142.    The Prepetition Secured Parties liens on the Challenged Leases were, however,

properly recorded and perfected.

143.    **The Metcalf Lease**.  Exhibit A to the *Amended and Restated Mortgage, Deed of*

*Trust, Security Agreement, Financing Statement and Assignment of Production dated April 13,*

*2018 from SN Palmetto, LLC, as Grantor, to Charles R. Salmon, as Trustee, and Royal Bank of Canada, as Collateral Trustee, as Mortgagee* ("<u>Amended Metcalf Lease Mortgage</u>"), which was recorded in Dewitt County, Texas on 4/18/18, Instr. No. 121269, Vol. 609, Pg. 532, identified Lease No. T0619007-001, between Evelyn Metcalf, as Lessor, and Anadarko E&P Company LP, dated September 23, 2010 (the "<u>Metcalf Lease</u>"), and noted that such lease was filed in Dimmit County, Texas at Book 402, page 201 (Instrument No. 17630).  See Exhibit A to Amended Metcalf Lease Mortgage, attached hereto as **<u>Exhibit B</u>**.  The Debtors' assert that the failure to specifically reference an instrument filed to correct the lease description—which was recorded at Vol. 415, Page 461, Dimmit County—is fatal.  However, the original Metcalf Lease is correctly described on the Amended Metcalf Mortgage, and paragraph 4 of the Introduction to Exhibit A to the Amended Metcalf Lease Mortgage states that "[e]ach reference to a lease or a contract in Exhibit A shall be deemed a reference to said lease or contract as said lease or contract may have been amended or ratified by all amendments or ratifications heretofore executed, whether or not referred to herein."

144.    Accordingly, the Metcalf Lease was identified with absolute specificity in the Amended Metcalf Lease Mortgage, and such mortgage was recorded in all applicable counties. Further, a reasonably prudent bona fide purchaser would have had constructive and/or inquiry notice of the Collateral Trustee's liens in the Metcalf Lease.

145.    **<u>The Sinclair Lease</u>**.  Exhibit A to the *Amended and Restated Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production dated April 13, 2018 from SN Palmetto, LLC, as Grantor, to Charles R. Salmon, as Trustee, and Royal Bank of Canada, as Collateral Trustee, as Mortgagee* (the "<u>Amended Sinclair Lease Mortgage</u>"), which was recorded in Dewitt County, Texas on 4/18/18, Instr. No. 121269, Vol. 609, Pg. 532, identified

Lease No. T0619007-019 between Frances Ann Sinclair, as Lessor, and Anadarko E&P Company LP, as Lessee, dated March 18, 2011 (the "Sinclair Lease"), and noted that such lease was filed in Dimmit County, Texas at Book 406, page 736 (Instrument No. 18414).  *See* Exhibit A to the Amended Sinclair Lease Mortgage, attached hereto as **Exhibit C**.  The Debtors incorrectly contend that because the Amended Sinclair Lease Mortgage does not reference a subsequent amendment of the Sinclair Lease, it's defective.

146.    Paragraph 4 of the Introduction to Exhibit A to the Amended Sinclair Lease Mortgage states that "[e]ach reference to a lease or a contract in Exhibit A shall be deemed a reference to said lease or contract as said lease or contract may have been amended or ratified by all amendments or ratifications heretofore executed, whether or not referred to herein."

147.    Accordingly, the Sinclair Lease was identified with absolute specificity in the Amended Sinclair Lease Mortgage, and such mortgage was recorded in all applicable counties. And a reasonably prudent bona fide purchaser would have had constructive and/or inquiry notice of the Collateral Trustee's liens in the Sinclair Lease.

148.    **The Harrison Lease**.  The Harrison Lease (as defined below) property is a contiguous tract crossing Dimmit, La Salle, and Webb counties.  Notably, an instrument affecting title to a contiguous tract crossing multiple counties may be recorded in **any county where the property is located**.  Tex. Prop. Code § 11.001(a); *Aston Meadows, Ltd. v. Devon Energy Prod. Co.*, 359 S.W.3d 856, 862 (Tex. App.—Fort Worth 2012, pet. denied) (citing *Brown v. Lazarus*, 25 S.W. 71 (Tex. Civ. App. 1893, no writ.)).  The Harrison Lease is recorded at Book 386, page 510, Dimmit County, Texas (Instrument No. 15055), Book 505, page 161 of La Salle County, Texas (Instrument No. 86051), and Book 2943, page 294 of Webb County, Texas (Instrument No.

1072987).  Each copy of the referenced Harrison Lease document, at each such location, describes the entire lease property with absolute certainty.

149.    Exhibit A to the *Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production dated June 30, 2014 from SN Catarina LLC to Charles R. Salmon, as Trustee for the benefit of Royal Bank of Canada, as Administrative Agent, as Mortgagee* (the "Harrison Lease Mortgage"), identified as mortgaged property Lease No. TX23565.001 between Harrison Interests, as Lessor, and P Ranch Working Interest LLC, as Lessee, dated May 12, 2010 (the "Harrison Lease"), recorded in Book 386, page 510 of Dimmit County, Texas (Instrument No. 15055), Book 505, page 161 of La Salle County, Texas (Instrument No. 86051), and ***Book 2943, page 294*** of Webb County, Texas (***Instrument No. 1072987***).[27]  *See* Exhibit A to Harrison Lease Mortgage, attached hereto as **Exhibit D**.

150.    The Harrison Lease Mortgage describes all recording locations of the Harrison Lease, and each recorded lease independently provides a correct description of the mortgaged property.  The Harrison Lease Mortgage was recorded in *each of the three counties in which the Harrison Lease is located*; specifically, it was recorded in Dimmit County, Texas on 7/7/14, Instr. No. 34516, Vol. 518, Pg. 103; in La Salle County, Texas on 7/1/14, Instr. No. 00112744, Vol. 800, Pg. 55; and in Webb County, Texas on 7/8/14, Doc. No. 1206055, Vol. 3642, Pg. 438.  *See* Recorded Copies of Harrison Lease Mortgage, attached hereto as **Exhibit D**.

151.    Notably, paragraph 2 of the Introduction to Exhibit A for the Harrison Lease Mortgage states that "[t]his instrument is intended to cover the entire interest of the Grantor in any lease described in Exhibit 'A', including (without limitation) even if a lease is listed under one set

---

[27] Notably, the Book, Page and Instrument Numbers in **bold**, showing the correct recording location of the Harrison Lease, were specifically included in the Amended Harrison Lease Mortgage.  However, "Dimmit" was erroneously substituted for "Webb" County.

of wells but erroneously is not listed under another set of wells.  Reference is made to the land descriptions contained in the documents of title recorded as described in Exhibit 'A.'"[28]

152.    When the Harrison Lease Mortgage was amended and restated in 2018 in the *Amended and Restated Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production dated April 13, 2018 from SN Catarina LLC to Charles R. Salmon, as Trustee for the benefit of Royal Bank of Canada, as Collateral Trustee, as Mortgagee* (the "Amended Harrison Lease Mortgage"), Exhibit A of the Amended Harrison Lease Mortgage included a clerical error because it identified Lease No. T0615001 between Harrison Interests, as Lessor, and P Ranch Working Interest LLC, as Lessee, dated May 12, 2010, recorded at **Book 2943, page 294** Dimmit County, Texas (**Instrument No. 1072987**).[29]  *See* Exhibit A to Amended Harrison Lease Mortgage, which is attached hereto as **Exhibit E**.  Notably, neither RBC nor any agent of RBC negotiated, drafted, controlled, coordinated, or oversaw the drafting of, the Amended Harrison Lease Mortgage, because it was not the responsibility of RBC under the terms of the Collateral Trust Agreement.  Rather, the negotiations occurred between the Debtors and the original note purchaser and lead underwriter.

153.    The Amended Harrison Lease Mortgage was recorded in all of the counties where the Harrison Lease is located: specifically, Dimmit County, Texas on 4/24/18, Instr. No. 47366, Vol. 614, Pg. 739, in La Salle County, Texas on 4/24/18, Instr. No. 1208014, Vol. 991, Pg. 191, and in Webb County, Texas on 4/17/18, Doc. No. 1326473, Vol. 4403, Pg. 71.  *See* Recorded Copies of Amended Harrison Lease Mortgage, which are attached hereto as **Exhibit E**.

---

[28] Further, paragraph 4 of the Introduction to Exhibit A of the Harrison Lease Mortgage states that "[e]ach reference to a lease or a contract in Exhibit 'A' shall be deemed a reference to said lease or contract as said lease or contract may have been amended or ratified by all amendments or ratifications heretofore executed, whether or not referred to herein."

[29] The recording information in **bold** is the correct recorded location of the Harrison Lease, as recorded in Webb County.  And the Harrison Lease property is a contiguous tract crossing Dimmit, La Salle, and Webb Counties.

154.    Importantly, the Amended Harrison Lease Mortgage specifically references the Harrison Lease Mortgage which describes the Harrison Lease and each filing location for the Harrison Lease in each of Dimmit, Webb, and La Salle Counties with absolute precision.

155.    And, paragraph 2 of the Introduction to Exhibit A of the Amended Harrison Lease Mortgage states that "[t]his instrument is intended to cover <u>the entire interest of the Grantor in any lease described in Exhibit 'A'</u>, including (without limitation) even if a lease is listed under one set of wells but erroneously is not listed under another set of wells.  Reference is made to the land descriptions contained in the documents of title recorded as described in Exhibit 'A.'"[30]

156.    By (i) identifying the Harrison Lease Mortgage, which describes the Harrison Lease including each filing location of the Harrison Lease in each of Dimmit, Webb, and La Salle Counties with absolute precision, (ii) identifying the lease number, lessor, lessee, date of the lease, and the Book, Page, and Instrument Number., for the location of the lease as filed in Webb County, (iii) referencing the lessor, lessee, date of the lease and <u>Dimmit County</u> (a county in which the lease is recorded, and (iv) filing copies of the Amended Harrison Lease Mortgage in all applicable counties, the Harrison Lease was described with reasonable (if not absolute) certainty, and a reasonably prudent bona fide purchaser had constructive and/or inquiry notice of the Collateral Trustee's liens in the Harrison Lease.  Under the statute of frauds, a description of property in an instrument creating an interest in land "is sufficient if the writing furnishes within itself, ***or by reference to some other existing writing***, the means or data by which the particular land to be conveyed may be identified with reasonable certainty."  *AIC Mgmt. v. Crews*, 246 S.W.3d 640,

---

[30] Further, paragraph 4 of the Introduction to Exhibit A of the Amended Harrison Lease Mortgage states that "[e]ach reference to a lease or a contract in Exhibit 'A' shall be deemed a reference to said lease or contract as said lease or contract may have been amended or ratified by all amendments or ratifications heretofore executed, whether or not referred to herein."

645 (Tex. 2008) (emphasis added);[31] *see also Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972); *Broaddus v. Grout*, 258 S.W.2d 308, 309–10 (Tex. 1953).  Filing the Amended Harrison Lease Mortgage in any one county where the lease was located, would have been sufficient to perfect the lien as to the entire leasehold.  Tex. Prop. Code § 11.001(a).  Instead, it was filed in all relevant counties.

157.  **The Hausser Lease**.  The Hausser Lease (as defined below) property is a contiguous tract crossing Zavala and Frio Counties.  The Hausser Lease is recorded in Volume 314, Page 128, Zavala County, Texas, and in Volume 76, Page 625, Frio County, Texas.  Each copy of the referenced lease instrument, at each such location, describes the entire lease property with absolute certainty.  Exhibit A to the *Second Amendment and Supplement to Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production from SN Palmetto, LLC, as Grantor, to Charles R. Salmon, as Trustee, and Royal Bank of Canada, as Administrative Agent, as Mortgagee, dated August 31, 2016* (the "Hausser Lease Mortgage"), identified as mortgaged property the "Oil and Gas Lease effective June 7, 2010, by and between Robert Hausser, Jr., Albert F. Hausser and William S. Hausser, Lessor, and SEP Holdings II, LLC, Lessee, covering 5,559.20 acres of land, more or less, situated in Frio and Zavala Counties, Texas" (the "Hausser Lease"), and noted that such lease was recorded in **Volume 314, Page 128**, Zavala County, Texas, and in Volume 76, Page 625, Frio County, Texas.[32]  *See* Exhibit A to Hausser Lease Mortgage, attached hereto as **Exhibit F**.

158.  The Hausser Lease Mortgage was recorded in Frio County, Texas on 9/12/16, Instr. No. 147192, Vol. 209, Pg. 334 and in Zavala County, Texas on 9/19/16, Instr. No. 93292, Vol.

---

[31] Notably, the Debtors cited *AIC Management* in their own Complaint.  *See* Complaint at ¶ 64, n. 10.

[32]  Notably, the Volume and Page numbers in **bold**, showing the correct recording location of the Hausser Lease were specifically included in the Amended Hausser Lease Mortgage.  However, "Frio" was erroneously substituted for "Zavala" County.

390, Pg. 591.  *See* Recorded Copies of Hausser Lease Mortgage, attached hereto as **Exhibit F**.
Notably, Exhibit A to the Hausser Lease Mortgage stated that the description of the lands covered
by the lease are "more particularly described" in the recorded leases.

159.    When the Hausser Lease Mortgage was amended and restated in 2018 in the
*Amended and Restated Mortgage, Deed of Trust, Security Agreement, Financing Statement and
Assignment of Production dated April 13, 2018 from SN Palmetto, LLC, as Grantor, to Charles R.
Salmon, as Trustee, and Royal Bank of Canada, as Collateral Trustee, as Mortgagee* (the
"Amended Hausser Lease Mortgage"), Exhibit A of the Amended Hausser Lease Mortgage
included a clerical error because it identified Lease No. T0474005 between Hausser, Robert Jr. *et
al.*, as Lessor, and SEP Holdings II LLC, as Lessee, dated June 7, 2010, recorded at **Volume 314,
Page 128** in *Frio County, Texas*.[33]  *See* Exhibit A to Amended Hausser Lease Mortgage, which is
attached hereto as **Exhibit G**.[34]  The Amended Hausser Lease Mortgage was recorded in Frio
County, Texas on 4/17/18, Instr. No. 151350, Vol. 239, Pg. 319 and Zavala County, Texas on
4/17/18, Instr. No. 95634, Vol. 407, Pg. 498.  *See* Recorded Copies of Amended Hausser Lease
Mortgage, which are attached hereto as **Exhibit G**.

160.    Paragraph 2 of the Introduction to Exhibit A for the Amended Hausser Lease
Mortgage states that "[t]his instrument is intended to cover the entire interest of the Grantor in any
lease described in Exhibit 'A', including (without limitation) even if a lease is listed under one set

---

[33] This Volume and Page number reference is the correct recording location for the Hausser Lease in Zavala County,
Texas.
[34] Neither RBC nor any agent of RBC negotiated, drafted, controlled, coordinated, or oversaw the drafting of the
Amended Hausser Lease Mortgage.  Rather, it was negotiated by the Debtors and the original note purchaser and lead
underwriter.

of wells but erroneously is not listed under another set of wells.  Reference is made to the land descriptions contained in the documents of title recorded as described in Exhibit 'A.'"[35]

161.    By (i) identifying the Hausser Lease Mortgage, which describes the Hausser Lease including each filing location of the Hausser Lease in each of Zavala and Frio Counties with absolute precision, (ii) identifying the lease number, lessor, lessee, date of the lease, and the Book, Page, and Instrument Number, for the location of the lease as filed in Zavala County, (iii) referencing the lessor, lessee, date of the lease and Frio County (a county in which the lease is recorded), and (iv) filing copies of the Amended Hausser Lease Mortgage in all applicable counties, the Hausser Lease was described with reasonable (if not absolute) certainty, and a reasonably prudent bona fide purchaser had constructive and/or inquiry notice of the Collateral Trustee's liens in the Hausser Lease.  Under the statute of frauds, a description of property in an instrument creating an interest in land "is sufficient if the writing furnishes within itself, *or by reference to some other existing writing*, the means or data by which the particular land to be conveyed may be identified with reasonable certainty."  *AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008) (emphasis added);[36] *see also Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972); *Broaddus v. Grout*, 258 S.W.2d 308, 309–10 (Tex. 1953).  Filing the Amended Hausser Lease Mortgage in any one county where the lease was located, would have been sufficient to perfect the lien as to the entire leasehold.  Tex. Prop. Code § 11.001(a).  It was filed in all counties where the lease property is located.

---

[35] Further, paragraph 4 of the Introduction to Exhibit A of the Amended Hausser Lease Mortgage states that "[e]ach reference to a lease or a contract in Exhibit 'A' shall be deemed a reference to said lease or contract as said lease or contract may have been amended or ratified by all amendments or ratifications heretofore executed, whether or not referred to herein."

[36] Notably, the Debtors cited *AIC Management* in their own Complaint.  *See* Complaint at ¶ 64, n. 10.

162.    **The Koenning Lease**.   The Koenning Lease (as defined below) property is a contiguous tract crossing Gonzales and DeWitt Counties.   The Koenning Lease is recorded in Book 999, Page 837, Gonzales County, Texas and Book 434, Page 1 DeWitt County, Texas.   Each copy of the referenced lease instrument, at each such location, describes the entire lease premises with absolute certainty.   Exhibit A to the *Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production from SEP Holdings III, LLC to Harve Truskett, Trustee, for the benefit of Capital One, N.A., as Administrative Agent under the Credit Agreement, as Mortgagee, Dated November 15, 2012* (the "Koenning Lease Mortgage"), specifically identified Lease No. T0463045, between Roy Allen Koenning, as Lessor, and EOG Resources Inc., as Lessee, dated February 10, 2009 (the "Koenning Lease"), and stated that such lease was recorded in Gonzalez County, Texas at volume **999, page 837**.[37]   *See* Exhibit A to Koenning Lease Mortgage, attached hereto as **Exhibit H**.   The Koenning Lease Mortgage was recorded in Gonzales County, Texas on 11/20/12, Instr. No. 262951, Vol. 1107, Pg. 743, and in DeWitt County, Texas, on 11/20/12, Instr. No. 93209, Vol. 453, Pg. 305.   *See* Recorded Copies of Koenning Lease Mortgage, attached hereto as **Exhibit H**.

163.    Notably, paragraph 2 of the Introduction to Exhibit A to the Koenning Lease Mortgage stated that "[t]his instrument is intended to cover the entire interest of the Grantor in any lease described in Exhibit 'A', including (without limitation) even if a lease is listed under one set of wells but erroneously is not listed under another set of wells.   Reference is made to the land descriptions contained in the documents of title recorded as described in Exhibit 'A.'"[38]

---

[37] Notably, the Book and Page numbers in **bold**, showing the correct recording location of the Koenning Lease in Gonzales County, were specifically included in the Amended Koenning Lease Mortgage.   However, "DeWitt" was erroneously substituted for "Gonzalez" County.

[38] Further, paragraph 4 of the Introduction to Exhibit A of the Koenning Lease Mortgage states that "[e]ach reference to a lease or a contract in Exhibit 'A' shall be deemed a reference to said lease or contract as said lease or contract

164.     When the Koenning Lease Mortgage was amended and restated in 2018 in the *Amended and Restated Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production dated April 13, 2018 from SN Palmetto, LLC, as Grantor, to Charles R. Salmon, as Trustee, and Royal Bank of Canada, as Collateral Trustee, as Mortgagee* (the "<u>Amended Koenning Lease Mortgage</u>"), Exhibit A of the Amended Koenning Lease Mortgage included a clerical error because it identified Lease No. T0463045 between Koenning, Roy Allen, as Lessor, and EOG Resources Inc., as Lessee, dated February 10, 2009, recorded at **Book 999, Page 837**, **Instrument No. 239874** *<u>DeWitt County</u>*, Texas. *See* Exhibit A to Amended Koenning Lease Mortgage, which is attached hereto as **<u>Exhibit I</u>**.[39] The Amended Koenning Lease Mortgage was recorded in each of Dewitt County, Texas on 4/18/18, Instr. No. 121269, Vol. 609, Pg. 532 and in Gonzales County, Texas on 4/17/18, Instr. No. 18293871, Vol. 1278, Pg. 664. *See* Recorded Copies of Amended Koenning Lease Mortgage, which are attached hereto as **<u>Exhibit I</u>**.

165.     Paragraph 2 of the Introduction to Exhibit A for the Amended Koenning Lease Mortgage states that "[t]his instrument is intended to cover the <u>entire interest of the Grantor in any lease described in Exhibit 'A'</u>, including (without limitation) even if a lease is listed under one set of wells but erroneously is not listed under another set of wells.  Reference is made to the land descriptions contained in the documents of title recorded as described in Exhibit 'A.'"[40]

166.     By (i) identifying the Keonning Lease Mortgage, which describes the Keonning Lease including the filing location of the Keonning Lease in Gonzalez County with absolute

---

may have been amended or ratified by all amendments or ratifications heretofore executed, whether or not referred to herein."

[39] Neither RBC nor any agent of RBC negotiated, drafted, controlled, coordinated, or oversaw the drafting of the Amended Koenning Lease Mortgage.  Rather, it was negotiated between the Debtors and the original note purchaser and lead underwriter.

[40] Further, paragraph 4 of the Introduction to Exhibit A of the Amended Koenning Lease Mortgage states that "[e]ach reference to a lease or a contract in Exhibit 'A' shall be deemed a reference to said lease or contract as said lease or contract may have been amended or ratified by all amendments or ratifications heretofore executed, whether or not referred to herein."

precision, (ii) identifying the lease number, lessor, lessee, date of the lease, and the Book, Page, and Instrument No., for the location of the lease as filed in Gonzalez County, (iii) referencing the lessor, lessee, date of the lease and DeWitt County (a county in which the lease is recorded) and (iv) filing copies of the Amended Keonning Lease Mortgage in all applicable counties, the Keonning Lease was described with reasonable (if not absolute) certainty, and a reasonably prudent bona fide purchaser had constructive and/or inquiry notice of the Collateral Trustee's liens in the Keonning Lease.  Under the statute of frauds, a description of property in an instrument creating an interest in land "is sufficient if the writing furnishes within itself, *or by reference to some other existing writing*, the means or data by which the particular land to be conveyed may be identified with reasonable certainty."  *AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008) (emphasis added);[41] *see also Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972); *Broaddus v. Grout*, 258 S.W.2d 308, 309–10 (Tex. 1953).  Filing the Amended Keonning Lease Mortgage in any one county where the lease was located, would have been sufficient to perfect the lien as to the entire leasehold.  Tex. Prop. Code § 11.001(a).  It was filed in all counties in which the lease property was located.

167.  **The Briscoe Lease**.  The Briscoe Lease (as defined below) property is a contiguous tract crossing Dimmit and LaSalle Counties.  The Briscoe Lease (evidenced by two lease memoranda) is recorded in Dimmit County, Texas at Book 329, page 138 (Instrument No. 7002) and Book 330, page 379 (Instrument No. 7250), and in LaSalle County, Texas at Book 458, page 515 (Instrument No. 78892) and Book 460, page 230 (Instrument No. 79159).  Exhibit A to the *Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production dated April 6, 2017 from SN EF Maverick, LLC to Charles R. Salmon, as Trustee for the benefit*

---

[41] Notably, the Debtors cited *AIC Management* in their own Complaint.  *See* Complaint at ¶ 64, n. 10.

*of Royal Bank of Canada, as Administrative Agent, as Mortgagee* (the "Briscoe Lease Mortgage")

identified the lease between Briscoe Ranch Inc., as Lessor, and Edward G. Vaughan, as Lessee,

dated December 1, 2005 (the "Briscoe Lease"), and noted that such lease was filed in Dimmit

County, Texas at Book 329, page 138 (Instrument No. 7002) and Book 330, page 379 (Instrument

No. 7250) and in LaSalle County, Texas at Book 458, page 515 (Instrument No. 78892) and Book

460, page 230 (Instrument No. 79159).  *See* Exhibit A to Briscoe Lease Mortgage, attached hereto

as **Exhibit J**.  The Briscoe Lease Mortgage was recorded in Dimmit County, Texas on 4/20/17,

Instr. No. 44493, Vol. 592, Pg. 521 and in La Salle County, Texas on 4/11/17, Doc. No. 124958,

Vol. 952, Pg. 99.  *See* Recorded Copies of Briscoe Lease Mortgage, attached hereto as **Exhibit J**.

168.    When the Briscoe Lease Mortgage was amended and restated in 2018 in the

*Amended and Restated Mortgage, Deed of Trust, Security Agreement, Financing Statement and*

*Assignment of Production dated April 13, 2018 from SN EF Maverick, LLC to Charles R. Salmon,*

*as Trustee for the benefit of Royal Bank of Canada, as Collateral Trustee, as Mortgagee* (the

"Amended Briscoe Lease Mortgage"), Exhibit A of the Amended Briscoe Lease Mortgage

correctly identified Lease No. T0616002-001 between Briscoe Ranch Inc., as Lessor, and Edward

G Vaughan, as Lessee, dated December 1, 2005, and noted that such lease was filed in **Dimmit**

**County, Texas at Book 329, page 138 (Instrument No. 7002)**.  *See* Exhibit A to Amended

Briscoe Lease Mortgage, which is attached hereto as **Exhibit K**.[42]  The Amended Briscoe Lease

Mortgage was recorded in Dimmit County, Texas on 4/24/18, Instr. No. 47367, Vol. 614, Pg. 786

and in La Salle County, Texas on 4/24/18, Doc. No. 128016, Vol. 991, Pg. 286.  *See* Recorded

Copies of Amended Briscoe Lease Mortgage, which are attached hereto as **Exhibit K**.

---

[42] Neither RBC nor any agent of RBC negotiated, drafted, controlled, coordinated, or oversaw the drafting of the
Amended Briscoe Lease Mortgage.  Rather, it was negotiated between the Debtors and the original note purchaser
and lead underwriter.

169.     Paragraph 2 of the Introduction to Exhibit A for the Amended Briscoe Lease Mortgage states that "[t]his instrument is intended to cover the entire interest of the Grantor in any lease described in Exhibit 'A', including (without limitation) even if a lease is listed under one set of wells but erroneously is not listed under another set of wells.  Reference is made to the land descriptions contained in the documents of title recorded as described in Exhibit 'A.'" Further, paragraph 4 of the Introduction to Exhibit A of the Amended Briscoe Lease Mortgage states that "[e]ach reference to a lease or a contract in Exhibit 'A' shall be deemed a reference to said lease or contract as said lease or contract may have been amended or ratified by all amendments or ratifications heretofore executed, whether or not referred to herein."

170.     Accordingly, the Briscoe Lease Mortgage and the Amended Briscoe Lease Mortgage describe the Briscoe Lease with absolute certainty.

171.     **The Pilgrim Lease**.  The Pilgrim Lease (as defined below) property is a contiguous tract crossing DeWitt and Gonzalez Counties.  The Pilgrim Lease is recorded in Gonzalez County, Texas at volume 989, page 143 (Instrument No. 237576) and in Dewitt County, Texas at volume 269, page 759 (Instrument No. 61055).  Each copy of the Pilgrim Lease is identical and describes the lease premises with absolute certainty.  Exhibit A to the *Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production from SEP Holdings III, LLC to Harve Truskett, Trustee, for the benefit of Capital One, N.A., as Administrative Agent under the Credit Agreement, as Mortgagee, Dated November 15, 2012* (the "Pilgrim Lease Mortgage", and together with the Harrison Lease Mortgage, the Hausser Lease Mortgage, the Koenning Lease Mortgage, and the Briscoe Lease Mortgage, the "Original Mortgages") identified Lease No. TO463003 between Pilgrim Lake, Ltd., as Lessor, and SEP Holdings II LLC, as Lessee, dated August 25, 2008 (the "Pilgrim Lease"), and noted that such lease was recorded in Gonzalez

County, Texas at volume 989, page 143 (Instrument No. 237576) and in Dewitt County, Texas at volume 269, page 759 (Instrument No. 61055). *See* Exhibit A to the Pilgrim Lease Mortgage, attached hereto as **Exhibit L**. The Pilgrim Lease Mortgage was recorded in Gonzales County, Texas on 11/20/12, Instr. No. 262951, Vol. 1107, Pg. 743, and in DeWitt County, Texas, on 11/20/12, Instr. No. 93209, Vol. 453, Pg. 305. *See* Recorded Copies of Pilgrim Lease Mortgage, attached hereto as **Exhibit L**.

172.    When the Pilgrim Lease Mortgage was amended and restated in 2018 in the *Amended and Restated Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production dated April 13, 2018 from SN Palmetto, LLC, as Grantor, to Charles R. Salmon, as Trustee, and Royal Bank of Canada, as Collateral Trustee, as Mortgagee* (the "Amended Pilgrim Lease Mortgage"), Exhibit A of the Amended Pilgrim Lease Mortgage identified Lease No. T0463003 between Pilgrim Lake, Ltd., as Lessor, and SEP Holdings II LLC, as Lessee, dated August 25, 2008 in Gonzalez County, Texas, and correctly noted that such lease was filed in **Gonzalez County, Texas at Book 989, page 143 (Instrument No. 237576)**. *See* Exhibit A to Amended Pilgrim Lease Mortgage, which is attached hereto as **Exhibit M**.[43] The Amended Pilgrim Lease Mortgage was recorded in Dewitt County, Texas on 4/18/18, Instr. No. 121269, Vol. 609, Pg. 532 and in Gonzales County, Texas on 4/17/18, Instr. No. 18293871, Vol. 1278, Pg. 664. *See* Recorded Copies of Amended Pilgrim Lease Mortgage, which are attached hereto as **Exhibit M**.

173.    Paragraph 2 of the Introduction to Exhibit A for the Amended Pilgrim Lease Mortgage states that "[t]his instrument is intended to cover the entire interest of the Grantor in any

---

[43] Neither RBC nor any agent of RBC negotiated, drafted, controlled, coordinated, or oversaw the drafting of the Amended Pilgrim Lease Mortgage. Rather, it was negotiated between the Debtors and the original note purchaser and lead underwriter.

lease described in Exhibit 'A', including (without limitation) even if a lease is listed under one set of wells but erroneously is not listed under another set of wells.  Reference is made to the land descriptions contained in the documents of title recorded as described in Exhibit 'A.'"[44] Accordingly, the Pilgrim Lease Mortgage and the Amended Pilgrim Lease Mortgage describe the Pilgrim Lease with absolute certainty by providing the precise recorded location of the lease.

174.   **The Moody Lease**.  The Moody Lease (as defined below) property is a contiguous tract crossing Dimmit and LaSalle Counties.  Identical copies of the Moody Lease are recorded in Dimmit County, Texas at Book 328, page 487 (Instrument No.  7079) and in La Salle County, Texas at Book 460, page 233 (Instrument No. 79160).  Each copy of the lease describes the lease property with absolute certainty.  Exhibit A to the *Amended and Restated Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production dated April 13, 2018 from SN Cotulla Assets, LLC, as Grantor, to Charles R. Salmon, as Trustee for the benefit of Royal Bank of Canada, as Collateral Trustee, as Mortgagee* (the "Amended Moody Lease Mortgage") identifies Lease No. 10616002-002 between Moody Foundation *et al.*, as Lessor, and Edward G. Vaughan, as Lessee, dated December 1, 2005 (the "Moody Lease"), and notes that such lease was recorded in Dimmit County, Texas at Book 328, page 487 (Instrument No.  7079) and in La Salle County, Texas at Book 460, page 233 (Instrument No. 79160).  *See* Exhibit A to Amended Moody Lease Mortgage, attached hereto as **Exhibit N**.[45]  The Amended Moody Lease Mortgage was recorded in Dimmit County, Texas on 4/24/18, Instr. No. 47365, Vol. 614, Pg. 691 and in La Salle

---

[44] Further, paragraph 4 of the Introduction to Exhibit A of the Amended Pilgrim Lease Mortgage states that "[e]ach reference to a lease or a contract in Exhibit 'A' shall be deemed a reference to said lease or contract as said lease or contract may have been amended or ratified by all amendments or ratifications heretofore executed, whether or not referred to herein."

[45] Neither RBC nor any agent of RBC negotiated, drafted, controlled, coordinated, or oversaw the drafting of the Amended Moody Lease Mortgage.  Rather, it was negotiated between the Debtors and the original note purchaser and lead underwriter.

County, Texas on 4/24/18, Doc. No. 128015, Vol. 991, Pg. 238. *See* Recorded Copies of Amended Moody Lease Mortgage, attached hereto as **Exhibit N**.

175.     Accordingly, the Moody Lease was identified with absolute certainty in the Amended Moody Lease Mortgage, and such mortgage was recorded in all applicable counties. Thus, a reasonably prudent bona fide purchaser would have therefore had constructive and/or inquiry notice of the Prepetition Secured Parties liens in the Moody Lease.

### COUNT 1 – DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT THE COLLATERAL TRUSTEE HAS VALID, PERFECTED LIENS ON THE CHALLENGED LEASES

176.     RBC incorporates by reference all the preceding paragraphs as if set forth fully herein.

177.     As more fully described in Paragraphs 141-175:

a. A copy of each applicable amended and restated mortgage was recorded in each county in which the Challenged Leases are located;

b. Exhibit A of the applicable amended and restated mortgages identified each of the Challenged Leases with reasonable certainty by, at a minimum, referencing the original mortgage which provided the precise recording location for each recorded lease in every county in which it was located, the particular lease by lessor, lessee, date of the lease, recording information, and at least one of the counties in which the Challenged Leases were located;

c. Using such information, a reasonably prudent bona fide purchaser would be on notice of the Collateral Trustee's liens and could identify the Challenged Leases (and the property descriptions therein) with reasonable certainty using the information contained in the Deeds of Trust or by using the grantor-grantee index without any need to reference the recording information listed in Exhibit A of the applicable Amended and Restated Mortgages;

d. Each Challenged Lease provides the description of the leased property as located in multiple counties;

e. Using the grantor-grantee index, any reasonably prudent purchaser would find the applicable amended and restated mortgage and would see that the Challenged Leases are described in the mortgage exhibit.

178.    Further, including the recording information in Exhibit A of the applicable Amended and Restated Mortgages (as defined below) was unnecessary and immaterial for a reasonably prudent bona fide purchaser to have constructive and/or inquiry notice of the Prepetition Secured Parties' liens on the Challenged Leases.  A metes and bounds description is not required if the document "furnish[es] the data to identify the property with reasonable certainty."  *Tex. Builders v. Keller*, 928 S.W.2d 479, 481 (Tex. 1996).  If enough appears in the description such that a person familiar with the area can locate the property, the description is sufficient.  *See Apex Fin. Corp. v. Garza*, 155 S.W.3d 230, 237 (Tex. App.—Dallas 2004, pet. denied) (citing *Gates v. Asher*, 280 S.W.2d 247, 248–49 (Tex. 1955)).

179.    Trivial discrepancies in the description of mortgaged property will not serve to invalidate a description that otherwise complies with this rule.  *Edwards v. Federal Nat'l Mortgage Assoc.*, 545 S.W.3d 169, 175 (Tex. App.—El Paso 2017, pet. denied) (citing *Cunningham v. Buel*, 287 S.W. 683, 687 (Tex. Civ. App.—San Antonio 1926, no writ.)).

180.    Even if there are discrepancies in a description, if other information in the description leaves no doubt as to which property is being referenced, such discrepancies will not invalidate the instrument.  See *Rheem Acceptance Corp. v. Rowe*, 332 S.W.2d 353, 354 (Tex. App.—Amarillo 1959, writ ref'd n.r.e.).  As stated:

>    where the description in the instrument is ambiguous, inconsistent in its parts, or correct in one particular and false in another, the record is such as to naturally excite inquiry, and under such circumstances it therefore becomes the duty of the subsequent purchaser or incumbrancer to make inquiry for the purpose of ascertaining what property was actually the subject of the instrument.

*Id.* at 355 (quoting *Wiseman v. Watters*, 174 S.W. 815, 816 (Tex. 1915)).

181.    Further, Section 13.002 of the Texas Property Code states:

>    An instrument that is properly recorded in the proper county is: (1) notice to all persons of the existence of the instrument; and (2) subject to inspection by the public.

182.    An instrument affecting title to a contiguous tract crossing multiple counties may be recorded in **any county where the property is located**.  Tex. Prop. Code § 11.001(a); *Aston Meadows, Ltd. v. Devon Energy Prod. Co.*, 359 S.W.3d 856, 862 (Tex. App.—Fort Worth 2012, pet. denied) (citing *Brown v. Lazarus*, 25 S.W. 71 (Tex. Civ. App. 1893, no writ.)).

183.    The Texas recording system operates on the basis of a grantor/grantee index. Tex. Local Gov't Code § 193.003.  All Texas counties maintain indices that track instruments on the basis of grantor names and grantee names.  *Id.*  Examination of a lease's title involves locating the name of a lessee in the grantor index, which discloses whether that lessee granted any interest in the lease, whether by mortgage or sale.  In this way, the examiner locates all grants of any interest in a lease, connecting the chain of title from the original lessee to the present day.

184.    In the course of researching title to a particular lease or tract, a party is bound by any instrument that appears in his chain of title.  *Westland Oil Development Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex. 1982).  "Recorded instruments in a grantee's chain of title generally establish an irrebuttable presumption of notice."  *Aston Meadows, Ltd. v. Devon Energy Prod. Co., L.P.*, 359 S.W.3d 856, 859 (Tex. App.—Fort Worth 2012, pet. denied) (citing *Ford v. Exxon Mobil Chem. Co.*, 235 S.W.3d 615, 617 (Tex. 2007)).

185.    Furthermore, "[i]t is well settled that 'a purchaser is bound by *every* recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims.'"  *Westland Oil*, 637 S.W.2d at 908 (emphasis in original).  "The rationale of the rule is that *any* description, recital of fact, or reference to other documents puts the purchaser upon inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another, until the whole series

of title deeds is exhausted and a complete knowledge of *all the matters referred* to and affecting the estate is obtained." *Id.* (emphasis in original).

186.    "A person may also be charged with constructive notice for a deed outside his chain of title if facts appearing in the chain of title through which he claims would place a reasonably prudent person on inquiry as to the rights of other parties in the property conveyed." *Aston Meadows*, 359 S.W.3d at 859 (citing *Noble Mortg. & Invs., LLC v. D&M Invs., LLC*, 340 S.W.3d 65, 76 (Tex. App.—Houston [1st Dist.] 2011, no pet.)).  "Although a deed outside the chain of title does not impute constructive knowledge, a person may be charged with the duty to make a reasonable diligent inquiry using the facts at hand in the recorded deed." *Nguyen v. Chapa*, 305 S.W.3d 316, 324–25 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).  "Thus, every purchaser of land is charged with knowledge of all facts appearing in the chain of title through which he claims that would place a reasonably prudent person on inquiry as to the rights of other parties in the property conveyed." *Id.* at 325.

187.    Here, each of the Amended Metcalf Lease Mortgage, the Amended Sinclair Lease Mortgage, the Amended Harrison Lease Mortgage, the Amended Hausser Lease Mortgage, the Amended Keonning Lease Mortgage, the Amended Pilgrim Lease Mortgage, and the Amended Moody Lease Mortgage (collectively the "Amended and Restated Mortgages"), described the Challenged Leases with reasonable, if not absolute, certainty.  Any hypothetical purchaser reviewing title would start its review with the lease it is going to purchase.  Using the grantor-grantee index in any applicable county, the reviewer would locate the Amended and Restated Mortgages.

188.    The description in the four-corners of each Amended and Restated Mortgage would have placed a reasonably prudent person on notice of the Collateral Trustee's lien on the

Challenged Leases.  Each Amended and Restated Mortgage stated that "[t]his instrument is intended to cover the entire interest of the Grantor in any lease described in Exhibit A, including (without limitation) even if a lease is listed under one set of wells but erroneously is not listed under another set of wells.  Reference is made to the land descriptions contained in the documents of title recorded as described in Exhibit 'A.'"

189.     The description would have put a reasonably prudent person on notice that the lien covered all property described in the Challenged Leases.

190.     Accordingly, the Correction Instruments fixed only immaterial clerical errors, and a reasonably prudent bona fide purchaser would have had constructive and inquiry notice of the Prepetition Secured Parties' liens in the Challenged Leases without such Correction Instruments.

191.     Pleading further in the alternative, each of the Original Mortgages relating to the Challenged Leases included an assignment of all hydrocarbon production to RBC, subject to a license granted to the applicable Sanchez entity to sell its production.  *See* Original Mortgages at §§ 4.1–4.2.  For example, sections 4.1 and 4.2 of the Harrison Lease Mortgage provided that:

> 4.1. Grantor does hereby GRANT, SELL, ASSIGN, CONVEY, TRANSFER and SET OVER unto Mortgagee, its successors in title and assigns, and grant to Mortgagee, its successors in title and assigns, all of the following: ·
>
> (a) All Hydrocarbons and Other Minerals and all as-extracted collateral, and the proceeds therefrom, and products obtained or processed therefrom, and proceeds therefrom;
>
> (b) All amounts, or proceeds hereafter payable to, or to become payable to, Grantor or to which Grantor is entitled pursuant to all Subject Contracts now or hereafter relating to any part of the Subject Interests; and
>
> (c) All amounts, sums, monies, revenues and income which become payable to Grantor from, or with respect to, all of the Mortgaged Property or pursuant to any Subject Contract, present or future, now or hereafter constituting a part of the Mortgaged Properties.
>
> TO HAVE and TO HOLD the foregoing unto Mortgagee, its successors in title and assigns, forever, subject however, to the terms and provisions of this instrument.

> Until such time as an Event of Default has occurred and is continuing, Mortgagee hereby grants to Grantor a license to sell such production described above and receive the production Proceeds (defined below), which license shall automatically terminate upon the occurrence of an Event of Default and for so long as the same continues.
>
> 4.2. Subject to, and in accordance with, the applicable provisions of the Credit Agreement, Grantor hereby authorizes and empowers Mortgagee to demand, collect, receive and receipt for the "Proceeds" (defined herein to mean all production, proceeds and payments assigned hereunder, as described in Section 4.1 hereof), and to endorse and cash any checks and drafts payable to Grantor, or to Mortgagee for the account of Grantor, received in connection with the Proceeds. Grantor hereby appoints Mortgagee as the appointed agent· and attorney-in-fact of Grantor, for the purpose of executing any "Receipt" (defined herein to mean any transfer order, payment order, division order, receipt, release or other instrument) that Mortgagee deems necessary in order for Mortgagee to demand, collect, receive and receipt for the Proceeds.

Harrison Lease Mortgage at §§ 4.1–4.2.  The other Original Mortgages relating to the Challenged Leases contain the same language.  The assignment of production is a separate grant and interest in property, and the Amended and Restated Mortgages do not release or re-convey the assignment of production contained in the Original Mortgages relating to the Challenged Leases.  Accordingly, even if the liens and security interests relating to the Challenged Leases are invalidated (which RBC vigorously opposes), the assignment of production granted pursuant to the Original Mortgages relating to the Challenged Leases remains unaffected by the Amended and Restated Mortgages, and as such, all production relating to the Challenged Leases remains fully encumbered.

192.    Therefore, RBC is entitled to a declaratory judgment that the Collateral Trustee holds valid, perfected liens in the Challenged Leases.

**COUNT 2 – DECLARATORY JUDGMENT (IN THE ALTERNATIVE)
PURSUANT TO 28 U.S.C. § 2201 THAT RBC HAD NO DUTY TO PREPARE THE
AMENDED AND RESTATED MORTGAGES IN CONNECTION WITH THE
FEBRUARY 14, 2018 TRANSACTION**

193.    RBC incorporates by reference all the preceding paragraphs as if set forth fully herein.

194.    The Complaint alleges in Paragraph 32, among other things, that the "Collateral Trustee's agent made material errors and omissions in preparing and filing the Deeds of Trust." This allegation is false.  The Deeds of Trust were negotiated between the Debtors and the lead underwriter / original note purchaser.  RBC's agent was not involved in the negotiations or the preparation of the Deeds of Trust.  The Debtors were responsible under the Collateral Trust Agreement for the preparation and filing of the Deeds of Trust.

195.    Neither RBC nor any agent of RBC had the duty or responsibility under the terms of the operative transaction documents to prepare or file the Amended and Restated Mortgages. The Collateral Trust Agreement provided that "[b]eyond the exercise of reasonable care in the **custody** of the Collateral in its possession, the Collateral Trustee will have no duty as to any Collateral in its possession or control . . . **will not be responsible for filing any financing** or continuation **statements or recording any documents or instruments** in any public office at any time or times **or otherwise perfecting or maintaining the perfection of any Liens on the Collateral**."  Collateral Trust Agreement § 5.12.  "[T]he **Company and/or the applicable Grantor shall be responsible for all filings** required in connection with any Security Document **and** the continuation, maintenance and/or **perfection of any such filing or the lien and security interest granted in connection therewith**."  *Id*.  "Except as provided in Section 5.12(a), the Collateral Trustee will not be responsible for the . . . validity, perfection, priority or enforceability of the Liens in any of the Collateral, for the validity or sufficiency of the Collateral or any

agreement or assignment contained therein . . . ." *Id.* "**The Collateral Trustee hereby disclaims any representation or warranty to the current and future holders of the Priority Lien Obligations concerning the perfection of the security interests granted to it** . . . . *Id.* "Notwithstanding anything to the contrary contained herein . . . the Collateral Trustee **will not be obligated to perform any of the obligations or duties of the Company or any Grantor**." *Id.* at § 5.13.

196.    Therefore, purely in the alternative, RBC seeks and is entitled to a declaratory judgment that it had no duty and was not responsible under the terms of the Collateral Trust Agreement for the preparation of the Amended and Restated Mortgages.

## COSTS, EXPENSES, AND ATTORNEYS' FEES

197.    RBC is entitled to recover its costs, expenses, and attorneys' fees in this action.

198.    As previously pled, RBC is owed indemnity obligations under the Prepetition Credit Agreement and the Collateral Trust Agreement; further, paragraph 19(e) of the Final DIP Order provides that RBC shall be entitled, as Adequate Protection (as defined in the Final DIP Order), to "all reasonable and documented accrued and unpaid fees and expenses."

199.    The obligation to provide Adequate Protection (as defined in the Final DIP Order), including the payment of RBC's fees and expenses, "shall continue in full force and effect until the DIP Obligations and Adequate Protection Claims, as applicable, are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated." Final DIP Order at ¶ 22(e).

200.     In the alternative, RBC is entitled to attorneys' fees and costs in this action pursuant to applicable law including Chapter 38 of the Texas Civil Practice & Remedies Code.[46]

## RESERVATION OF RIGHTS

201.     RBC reserves the right to amend or supplement this answer and counterclaim.

## PRAYER

WHEREFORE, RBC seeks entry of a final judgment declaring that the Prepetition Secured Parties have valid, perfected liens in and on the Challenged Leases, and granting any other and further relief to which it may be entitled.

*[remainder of page intentionally left blank]*

---

[46] Such right to payment includes payment of reasonable fees, costs, expenses and disbursements to the Collateral Trustee and/or its agents, including attorneys, for certain services provided under or relating to the Collateral Trust Agreement, as further detailed in section 7.8 of the Collateral Trust Agreement.

**DATED:** April 10, 2020.

Thompson & Knight LLP,

By: */s/ Tye C. Hancock*
Tye C. Hancock
Texas State Bar No. 24032271
Anthony F. Pirraglia
Texas State Bar No. 24103017
811 Main Street, Suite 2500,
Houston, Texas 77002
Telephone: 713.654.8111
E-mail:  Tye.Hancock@tklaw.com
          Anthony.Pirraglia@tklaw.com
-and-

Steven J. Levitt
Texas State Bar No. 24092690
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201
Telephone: 214.969.1700
Facsimile: 214.969.1751
E-mail: steven.levitt@tklaw.com

**ATTORNEYS FOR ROYAL BANK OF CANADA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing with exhibits was served on all parties entitled to notice via the Court's electronic notification system on this 10th day of April, 2020.

*/s/ Tye C. Hancock*
Tye C. Hancock